Martis Ann Alex (SBN 77903)
Daniel R. Leathers *(pro hac vice to be sought)*
Brian R. Morrison *(pro hac vice to be sought)*
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
malex@labaton.com
dleathers@labaton.com
bmorrison@labaton.com

Steve W. Berman *(pro hac vice to be sought)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RICHARD DRAEGER, STANLEY AND JANET NEILL, NEIL STEVENS, PATRICIA FLANNERY, HELEN CIANGIULLI, JUDITH HARR SHANE, and STEVEN GREEN, on behalf of themselves and those similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>TOYOTA MOTOR SALES, U.S.A., INC.<br><br>    Defendant. | **Case No.: 2:15-cv-09204**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................... 1

II.   PARTIES ................................................................................. 13

    A.   Plaintiffs .......................................................................... 13

        1.   California ................................................................. 13

            a.   Plaintiff Richard Draeger ............................ 13

            b.   Plaintiffs Stanley and Janet Neill (Joint Owners) ....... 15

            c.   Plaintiff Neil Stevens ................................... 17

        2.   Massachusetts ......................................................... 19

            a.   Plaintiff Patricia Flannery ........................... 19

        3.   New Jersey .............................................................. 21

            a.   Plaintiff Helen Ciangiulli ............................ 21

            b.   Plaintiff Judith Harr Shane .......................... 23

            c.   Plaintiff Steven Green .................................. 24

    B.   Defendant ........................................................................ 26

        1.   Toyota Group .......................................................... 26

            a.   Toyota .......................................................... 26

            b.   Lexus ............................................................ 27

            c.   The Toyota Group ........................................ 27

        2.   Other Automotive Groups ....................................... 27

III.  JURISDICTION ..................................................................... 28

IV.   VENUE .................................................................................... 29

V.    FACTUAL ALLEGATIONS .................................................. 29

    A.   The Keyless Fob ............................................................. 30

    B.   Without Auto-Off, Keyless Fobs Lead to Carbon Monoxide Poisoning ....................................................... 34

    C.   Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of

Vehicles with Keyless Fobs that lack Auto-Off through News Reports of Injuries and Deaths.......................................................... 35

D.     Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Recalls.... 40

E.     Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Automaker Patent Applications ....................................................... 41

F.     Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Third-Party Patent Applications.................................................................... 43

G.     Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Personal Injury Lawsuit Filings ............................................. 46

H.     Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Information in the NHTSA Complaint Database ........................... 49

I.     Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Various Non-Binding NHTSA Suggestions.................................................... 68

J.     Toyota Group has (and had) Actual Knowledge that the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs Can Be Fully Mitigated through the Implementation of Auto-Off ............................................................. 70

     a.     The Ford Group has Implemented Auto-Off for *Some* of its Vehicles but has Failed to Implement Auto-Off in *All* of its Vehicles ..................................... 71

     b.     The Honda Group has Implemented a *Battery-Saving* Accessory Mode Shut-Down since 2013 but not an *Engine* Auto-Off......................................... 72

     c.     The Vast Majority of the Automakers have Recognized the Danger of Carbon Monoxide by Implementing an Automatic Shut Down System for *Remote-Start* Vehicles but not for *Keyless Fob* Vehicles .............................................................. 73

VI.   EXCLUSIVE KNOWLEDGE, CONCEALMENT, AND SAFETY DEFECT ALLEGATIONS ........................................................ 74

VII.  TOLLING OF THE STATUTE OF LIMITATIONS ................................ 82

A.   Fraudulent Concealment Tolling ...................................................... 82

B.   Estoppel ............................................................................................. 82

C.   Discovery Rule .................................................................................. 83

VIII.   CLASS ACTION ALLEGATIONS .............................................................. 83

A.   Numerosity & Ascertainability ......................................................... 84

B.   Typicality .......................................................................................... 85

C.   Adequate Representation .................................................................. 85

D.   Predominance of Common Issues ..................................................... 86

E.   Superiority ......................................................................................... 88

IX.   CAUSES OF ACTION ............................................................................... 89

A.   Claims Brought on Behalf of the California Class .......................... 89

FIRST CAUSE OF ACTION Violation of California's
Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code §
1750, *et seq.*) .................................................................................... 89

SECOND CAUSE OF ACTION Violation of California's
Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et
seq.*) ................................................................................................... 91

THIRD CAUSE OF ACTION Violation of Cal. Civil Code §
1710 Deceit and Common Law Fraud ............................................... 93

FOURTH CAUSE OF ACTION California False Advertising
Law (FAL) (Bus. & Prof Code§ 17500 *et seq.*) .............................. 96

FIFTH CAUSE OF ACTION Unjust Enrichment (Under
California Law, in the Alternative, if the Court Determines the
California Plaintiffs and the proposed California Class have no
Adequate Remedy at Law under the California Plaintiffs' Other
Named Causes of Action) ................................................................. 98

B.   Claims Brought on Behalf of the Massachusetts Class ................... 99

SIXTH CAUSE OF ACTION Violations of the Massachusetts
Consumer Protection Act – Placeholder Claim Only  (Mass.
Gen. Laws Ch. 93A) ......................................................................... 99

SEVENTH CAUSE OF ACTION Breach of Implied Warranty of Merchantability (Mass. Gen. Laws Ch. 106, § 2-314) ............... 99

EIGHTH CAUSE OF ACTION Fraudulent Concealment (Based on Massachusetts Law) ....................................................... 100

NINTH CAUSE OF ACTION Unjust Enrichment (Under Massachusetts Law, in the Alternative, if the Court Determines the Massachusetts Plaintiff and the proposed Massachusetts Class have no Adequate Remedy at Law under the Massachusetts Plaintiff's Other Named Causes of Action) ........... 102

C.      Claims Brought on Behalf of the New Jersey Class ...................... 103

TENTH CAUSE OF ACTION Violations of the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, *et seq.*) .............. 103

ELEVENTH CAUSE OF ACTION Breach of Implied Warranty of Merchantability  (N.J. Stat. Ann. § 12A:2-314) ........ 104

TWELFTH CAUSE OF ACTION Fraudulent Concealment (Based on New Jersey Law) ........................................................... 105

THIRTEENTH CAUSE OF ACTION Unjust Enrichment (Under New Jersey Law, in the Alternative, if the Court Determines the New Jersey Plaintiffs and the proposed New Jersey Class have no Adequate Remedy at Law under the New Jersey Plaintiffs' Other Named Causes of Action) ........................ 106

PRAYER FOR RELIEF ................................................................. 107

DEMAND FOR JURY TRIAL ........................................................ 109

The above-captioned plaintiffs (collectively, "Plaintiffs"), individually and on behalf of all other owners and lessees of vehicles designed, manufactured, distributed, and/or sold by the defendant vehicle manufacturer (the "Class" or "Class Members"), allege the following as their First Amended Class Action Complaint and Demand for Jury Trial:

## I.    INTRODUCTION

1.    This Complaint seeks redress for a deadly defect associated with the remote-control electronic keyless fob system[1] (collectively, "Keyless Fobs") implemented by Defendant Toyota Motor Sales, U.S.A. Defendant Toyota Motor Sales, U.S.A., however, does not stand alone in its implementation of this technology. At least ten different auto manufacturing groups[2] (collectively, the "Automakers" or "Automaker Groups") have implemented functionally identical systems in their respective vehicles.

2.    Keyless Fobs are marketed as the ultimate driving convenience: drivers can keep the Keyless Fob in their pockets or bags and can start the car using the Keyless Fob without having to fumble for a traditional physical key. On rainy days or in cold weather, Keyless Fobs serve a convenient, useful purpose for quickly entering a vehicle.

3.    But, this so-called convenience has produced deadly consequences in the absence of adequate pre-sale warnings. Reasonable drivers, including Plaintiffs, misunderstand the role of the Keyless Fob in turning *off* the vehicle.

---

[1] *See* **Exhibit 1**. Although sometimes called different names by different automakers, Keyless Fobs all work in the same basic manner as it pertains to this suit as described herein. *See id.* (listing the various name designations that the Automakers have assigned to their respective Keyless Fobs).

**Exhibit 1** is the result of hundreds of hours of research and was compiled based on analysis of thousands of pages of sales brochures for each of the more than 1,500 models, submodels, and trim levels listed in **Exhibit 1.** The sales brochures confirm that each makes no mention of the lack of Auto-Off as defined and described herein.

[2] *See* ¶¶145-152 (outlining which automotive brands are controlled by which Automaker Group).

Reasonable drivers either mistakenly believe that removing the Keyless Fob from the vehicle turns off the engine or inadvertently fail to do so given the quiet nature of today's automobile engines. That confusion is unsurprising given the ever-changing technologies implemented by each of the Automaker Groups.

4.     Traditionally, vehicle keys were simple (hereinafter, "Physical Keys"). Drivers inserted a Physical Key into the ignition cylinder to turn on the vehicle engine. Drivers took the physical action of turning the key back counter-clockwise to remove the Physical Key, thereby turning the engine off. When a Physical Key was removed from the vehicle, the engine could no longer operate. Drivers took comfort in knowing that if they removed the Physical Key from the vehicle, the engine was off.

5.     Over the course of decades, drivers have associated the presence of the Physical Key with the operation of the vehicle's engine. Each of the Automaker Groups' Keyless Fobs operate contrary to that engrained driver behavior.

6.     The Keyless Fob operates very differently than traditional Physical Keys. Critically, the Keyless Fob *has nothing to do with turning off the engine*. In today's modern vehicles that have implemented Keyless Fobs, engines do not turn off simply because the Keyless Fob is removed from the vehicle, no matter the distance that the Keyless Fob is from the vehicle. For all of the vehicles listed in **Exhibit 1**, a driver can stop the vehicle, put it in park, exit with the Keyless Fob, and the vehicles' engine will still be running no matter how far away the driver goes from the car, and no matter how long the engine is running (hereinafter, the "Affected Vehicles").[3]

---

[3] The list of the Affected Vehicles is attached as **Exhibit 1**. The number of Affected Vehicles is in excess of 5,000,000 vehicles.

7.      Keyless Fobs were first introduced into the market in or about 2003 and are becoming an increasingly common feature in modern cars. A picture of a Keyless Fob is below:



8.      In many vehicles, the Keyless Fob is offered as part of an optional "convenience" or "technology" upgrade package, costing the consumer additional money. In other vehicles, the Keyless Fob is standard equipment with the cost of the hardware and technology built into the vehicle's price. In either case, consumers pay extra for the Keyless Fob feature, which adds additional costs to vehicles for hardware equipment and software development as compared to cars with Physical Keys.

9.      A Keyless Fob allows the driver to start the vehicle's ignition by sending an electronic signal to the vehicle's computer. Once the electronic signal is transmitted, and the vehicle senses the presence of the Keyless Fob, the driver can then press a button to start the engine (the "Start/Stop Button"). A picture of a Start/Stop Button is below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



10.     The Keyless Fob never needs to come into physical contact with the vehicle in order to start the engine. Instead, a Keyless Fob can remain in the driver's pocket, purse, jacket, or even on the passenger seat or elsewhere in the car and still be used in conjunction with the Start/Stop button to start the engine.

11.     However, the presence of the Keyless Fob is irrelevant to whether the engine is turned off when the car is stopped or parked. To turn off the engine, a driver still must press the Start/Stop Button, regardless of whether the Keyless Fob remains in the vehicle.

12.     In the name of convenience, and at an increased purchase price, each of the Automakers created Keyless Fobs without instituting the adequate safeguard – an automatic engine shutoff to ensure that the vehicle's engine does not continue to run unabated, emitting deadly carbon monoxide. The Automakers failed to properly consider the ramifications of eliminating the physical and psychological connection between the vehicle and Physical Keys.

13.     Upon information and belief, each of the Automakers similarly failed to undertake proper human factors analyses necessary to understand and address the hazards associated with replacing the Physical Key with a Keyless Fob.

14.     As a result, there is an inherent and imminent risk that the millions of drivers, including those who grew accustomed to using a Physical Key to turn off a vehicle—which traditionally was a simple and predictable task—fail to appreciate

that the Keyless Fob plays no role in turning off a Keyless Fob-equipped vehicle's engine. After a driver parks and exits the car, the Keyless Fob could be removed to miles away from the vehicle, and the engine still would not automatically turn off.

15.     Put simply, the Affected Vehicles are defective and unsafe because each of the Automakers, including Toyota Group, failed to include a basic safety mechanism whereby its Affected Vehicles, if left unattended with the engine still running, would automatically turn off after a certain period of time (hereinafter, "Auto-Off"). The lack of an Auto-Off system in the Affected Vehicles (hereinafter, the "Defect") is dangerous and defective for the reasons described herein.

16.     Despite the significant change in human interaction required to start and stop the vehicle engine when using Keyless Fobs, many drivers continue to equate Keyless Fobs with Physical Keys. This confusion can result (and has resulted) in deadly consequences as described in detail below.

17.     In a number of incidents, drivers have parked their Affected Vehicles inside their garages, removed the Keyless Fobs, and exited these vehicles only to later discover that the engines never actually turned off. As a result, deadly carbon monoxide—often referred to as the "silent killer" because it is a colorless, odorless, poisonous gas—can fill enclosed spaces and spread to the attached homes. The result has been at least 14 documented deaths and many more serious injuries requiring hospitalization—all from carbon monoxide poisoning, and all of which would have been prevented if the vehicles had Auto-Off.

18.     In just the past month, there have been at least two horrific stories of families that were seriously injured by the Defect, with many of the affected family members narrowly avoiding death. These stories perfectly illustrate that not only are drivers at risk from the Defect, but family members, innocent bystanders, and first responders can also be hospitalized simply because the vehicles were not equipped with Auto-Off. For example:

1    (a)    On October 31, 2015, a mother, Constance Petot returned from

2 a long day at work to her parents' home in the Jacksonville, Florida area, and

3 parked her vehicle in the attached garage. She believed that she had pressed the

4 Start/Stop button in her vehicle to turn off the engine, she closed the garage door,

5 and she went into the house. In the middle of the night, her 13-month-old son woke

6 up screaming. Constance knew something was wrong when she started feeling

7 dizzy and her son went limp in her arms. After walking downstairs, Constance

8 discovered that the vehicle engine was still running. She and her son both received

9 emergency medical treatment, and she subsequently learned that the level of

10 carbon monoxide in the house was high enough to have killed both her and her son

11 if they had remained in the house for only twenty additional minutes;[4] and

12    (b)    On November 7, 2015, in Issaquah, Washington, firefighters

13 were summoned by a neighbor to a household of six, which included two

14 grandparents, two parents, and two children—one child under 10 years old and the

15 other a 17-month-old baby.[5] The father had come home from work and believed he

16 had pressed the Start/Stop button in his Toyota Sienna vehicle to turn off the

17 engine. The Toyota Sienna is an Affected Vehicle. Despite the fact that the

18 family's house had carbon monoxide detectors on every floor, none of the alarms

19 alerted the family to the danger.[6] As a result, all six family members plus three of

20 the first-responder firefighters suffered from carbon monoxide poisoning and

21

22    [4] Jodie Fleischer, *2 Investigates: Keyless ignitions harm local families*, Actionnewsjax.com (Nov. 2, 2015),

23 http://www.actionnewsjax.com/news/news/local/2-investigates-keyless-ignitions-harm-local-famili/npFPm/ (last visited Nov. 12, 2015).

24    [5] Maria Guerrero, *Carbon monoxide poisoning sends family of six, three firefighters to hospital,* Kirotv.com (Nov. 7, 2015),

25 http://www.kirotv.com/news/news/carbon-monoxide-poisoning-sends-family-six-three-f/npJFK/ (last visited Nov. 12, 2015).

26    [6] Janet Kim, *Issaquah family back home after suffering from carbon monoxide*

27 *poisoning*. Q13 FOX News (Nov. 9, 2015), http://q13fox.com/2015/11/08/issaquah-family-back-home-after-suffering-from-carbon-monoxide-poisoning/ (last visited Nov. 12, 2015).

28

required hospitalization.[7] The neighbor's call could have been too late, though—the Toyota Sienna minivan fortunately ran out of gas before it could emit enough carbon monoxide to kill everyone in the household.[8] The 17-month-old baby was hospitalized and treated in a hyperbaric chamber with oxygen therapy for three days.[9]

19.    Additionally, in the past three months, another innocent person died from the Defect, putting the total number of confirmed deaths at fourteen, and eight new consumers filed complaints with the National Highway Traffic Safety Administration ("NHTSA") regarding the deadly carbon monoxide poisoning associated with Keyless Fobs. Despite the growing number of deaths and injuries, Toyota Group continues to ignore the deadly risk of failing to include Auto-Off in its Affected Vehicles.

20.    Symptoms of carbon monoxide poisoning include headaches, weakness, dizziness, nausea, vomiting, shortness of breath, confusion, blurred vision, and loss of consciousness. Additionally, a victim may suffer irreversible brain damage or death. When an Affected Vehicle is left running in an enclosed environment, such as a garage, the concentration of carbon monoxide in the air can quickly exceed 200 parts per million ("ppm") and rise rapidly. Once carbon monoxide levels rise to 1,600 ppm, persons suffer increased heart rates, dizziness,

---

[7] Carol Garnick, *Issaquah family hospitalized with carbon-monoxide poisoning*, The Seattle Times (Nov. 7, 2015), http://www.seattletimes.com/seattle-news/eastside/issaquah-family-hospitalized-with-carbon-monoxide-poisoning/ (last visited Nov. 12, 2015).

[8] KOMO News Network, *Issaquah family poisoned by carbon monoxide is back home*, KOMOnews.com (Nov. 9, 2015), http://www.komonews.com/news/local/Family-poisoned-by-carbon-monoxide-is-back-home-343260772.html?tab=video&c=y (last visited Nov. 12, 2015).

[9] Sky Valley Chronicle, *Issaquah family treated for carbon monoxide poisoning; Fumes entered the home,* skyvalleychronicle.com (Nov. 8, 2015), http://www.skyvalleychronicle.com/BREAKING-NEWS/ISSAQUAH-FAMILY-TREATED-FOR-CARBON-MONOXIDE-POISONING-BR-Fumes-entered-the-home-2311328 (last visited Nov. 12, 2015).

---

and nausea within 20 minutes and death in less than 2 hours. Over thirty-percent of U.S. homes have garages attached to the home.

21. Toyota Group was and is aware of the Defect. For example, individuals have filed personal injury and wrongful death lawsuits against several of the Automakers seeking recovery for death or injuries caused by the Defect. Perhaps unsurprisingly, many of those lawsuits have been resolved in confidential settlements. For example:

(a) On June 14, 2011, Kimberlin Nickles filed a wrongful death action against Toyota for the death of her 29-year-old daughter, Chastity Glisson, who died on August 26, 2010, as a result of carbon monoxide poisoning from her 2006 Lexus IS 250, an Affected Vehicle.[10] Chastity Glisson parked her Lexus in the garage. Later that night, she collapsed in the third-floor bathroom. Her boyfriend, Timothy Maddock, discovered her body and tried to help her, but then he too succumbed to the carbon monoxide that had by then filled the house and lost consciousness. Tragically, neither Ms. Glisson nor Mr. Maddock was found until the next day. By then, 29-year-old Chastity Glisson had died, and Timothy Maddock was critically injured and required hospitalization for ten days. An investigation revealed that the carbon monoxide that killed Ms. Glisson and severely injured Mr. Maddock came from the Lexus in the garage, which was equipped with a Keyless Fob and, unbeknownst to the occupants of the home, continued to run after the driver exited the vehicle.[11]

(b) On October 29, 2010, Mary Rivera filed a personal injury action against Toyota.[12] The Amended Complaint alleges that Ms. Rivera collapsed and was found barely breathing as a result of carbon monoxide poisoning caused

---

[10] *Nickles v. Gables Constr. Inc.*, No. 11013565 (Cir. Ct of the 17th Judicial Cir., Broward Cty., Fla. June 14, 2011).

[11] *Id.; see also* ¶ 180(f), *infra*.

[12] *Rivera v. Toyota Motor, N. Am., Inc.*, No. 1:10-cv-04998, ECF No. 1 (E.D.N.Y. Oct. 29, 2010).

by her 2008 Lexus EX 350, which was equipped with a Keyless Fob and which continued to run after the driver left the vehicle.[13] Ms. Rivera is a former college professor who now suffers from permanent brain damage as a result of the carbon monoxide poisoning. Though Ms. Rivera survived the incident, her partner Ernest Cordelia, Jr., who was a long-time attorney and was in the home with Ms. Rivera on the evening of the incident, died with 65 percent carbon monoxide poisoning in his blood according to an autopsy report.[14.]

(c)    Just a few months ago, in the evening of June 14, 2015, two people died as a result of the Defect. Rina and Pasquale Fontanini returned to their home in their 2013 Lincoln MKS. The couple parked their car in the attached garage and either inadvertently forgot to shut down the engine or pushed the Start/Stop button in an effort to do so. The couple then entered their home, but unbeknownst to them the car engine continued to run. Their house filled with deadly carbon monoxide and both Rina and Pasquale were later found dead the next day by their son, a lieutenant in the Highland Park Fire Department.[15] On August 20, 2015, the executrix of the Fontanini's estate filed a wrongful death lawsuit against Ford Motor Company, Lincoln Motor Company, and Libertyville Lincoln Sales, Inc., alleging strict liability arising out of the keyless ignition defect;[16]

---

[13] *Id.* at ECF No. 13.

[14] *See* ¶ 193. *infra.*

[15] Associated Press, *Carbon Monoxide Death Prompts Questions About Keyless Auto Ignitions,* Northernpublicradio.org. (June 22, 2015), http://northernpublicradio.org/post/carbon-monoxide-death-prompts-questions-about-keyless-auto-ignitions (last visited Aug. 5, 2015).

[16] *Manfredini v. Ford Motor Co.,* No. 15-L-592 (Cir. Ct. of Lake Cty., Ill, Aug. 20, 2015); *see also* Robert McCoppin, *Suit filed over keyless car for Highland Park couple who were poisoned,* Lake County News-Sun (Oct. 6, 2015), http://www.chicagotribune.com/suburbs/lake-county-news-sun/news/ct-keyless-ignition-deaths-lawsuit-met-20151005-story.html (last visited Oct. 6, 2015).

---

22.     Consumers have also filed complaints with NHTSA,[17] but Toyota Group has failed to take any action in response to the complaints.

23.     A detailed patent search has also revealed that the two largest U.S. Automakers—Ford and General Motors—have openly recognized the dangerous consequences associated with Keyless Fobs. At least one of those patent applications included language about preventing carbon monoxide poisoning in the event that the vehicle engine continues to run after the driver exits the vehicle.

24.     This mounting evidence, as described more fully herein, has been ignored by Toyota Group despite each possessing knowledge about the deadly consequences that can result when a driver exits a vehicle with or without the Keyless Fob and without having depressed the Start/Stop button. Nevertheless, even though an Auto-Off feature can be implemented without significant effort or cost, Toyota Group has refused to act.

25.     Auto-Off is not only feasible; it has *already* been implemented by Ford and GM in *some* of their recent makes and models to prevent the very tragedies described herein.

26.     The Keyless Fob incidents described throughout this Complaint are unsurprising given modern-day engine technologies. First, the Affected Vehicles lack the tell-tale signs that the vehicle engine is turned on. Toyota Group designed its Affected Vehicles to operate quietly with advanced engine vibration mounts, noise and harness reduction engineering, and exhaust baffling. Indeed, each of the Automakers has promoted the fact that their vehicle engines run quietly and smoothly as a marketing feature.[18] Second, hybrid and plug-in hybrid vehicles lack

---

[17] *See ¶¶* 200-201, *infra; see also* **Exhibit 2**.
[18] *See, e.g.,* **Exhibit 3** (The Buick "LaCrosse is engineered using a QuietTuning process. It's a carefully orchestrated application of sound-reducing, sound-blocking and sound-absorbing measures, including a windshield shaped to minimize turbulence, triple door seals, optimized engine mounts and special sealants.")

*any* tell-tale sign that the engine is running. In either case, consumers, including all Plaintiffs, are left without any clear sign that an Affected Vehicle's engine remains running even after parking the vehicle and removing the Keyless Fob.

27.     In addition to Toyota Group's failure to implement Auto-Off in its Affected Vehicles, Toyota Group has also failed to take any other adequate precaution to prevent against the dangerous situation of a car parked but left with the engine running. Counsel have collected and analyzed relevant pre-sale vehicle documents for each of the Affected Vehicles, and there are *no warnings* whatsoever in the Affected Automobiles' pre-sale materials to alert consumers of the deadly carbon monoxide risks associated with the Defect in the vehicles they intend to purchase or lease. This safety omission is material to any consumer's decision to purchase or lease a vehicle, including Plaintiffs' decisions.

28.     The resulting carbon monoxide risk is deadly. Affected Vehicles allow colorless and odorless carbon monoxide—the silent killer—to be emitted continually and unabated after the car is parked and the driver exits the vehicle. Those continuous noxious carbon monoxide emissions accumulate, especially in enclosed environments, and are dangerous to human health and potentially fatal.

29.     Because Toyota Group has failed to rectify or warn of the Defect in their sales brochures or any other pre-sale materials, or otherwise rectify Affected Vehicles and institute Auto-Off, the Defect has caused carbon monoxide poisoning that has caused at least 14 documented deaths across all of the Automakers and many more serious injuries resulting in hospitalizations, not to mention many "near misses" never reported by media outlets.

30.     Toyota Group has failed to take appropriate remedial actions in its Affected Vehicles in order to save lives despite the fact that the Keyless Fob is merely a convenience feature. Keyless Fobs are optional equipment on many

makes and models, and the feature is offered as an expensive upgrade package on many vehicles.[19]

31.     Careful review of all of Affected Vehicle sales brochures reveals that, without exception, Toyota Group has omitted the material fact that its Affected Vehicles are Defective and unsafe due to the lack of Auto-Off.

32.     Because of their design, including silent car engines, the Affected Vehicles are susceptible to repeated failures. Each use of an Affected Vehicle may endanger the vehicle occupants, family members, innocent bystanders, and first responders.

33.     The Defect impairs Class Members' proper and safe use of their vehicles, and endangers Class Members and persons near the Affected Vehicle. Class Members have no way to mitigate or change the Affected Vehicles' Keyless Fob functionality to render the vehicles safe. Toyota Group has the sole ability to institute a readily-available fix to remedy the Defect in Toyota Group's vehicles.

34.     Upon information and belief, and as described more fully below, Toyota Group has known of the Defect at all relevant times, yet has repeatedly failed to disclose the Defect to Class Members and the public, and continue to conceal the Defect, including through confidential personal injury settlements. As documented by the deaths and injuries caused by the Defect and as shown throughout this Complaint, the Affected Vehicles are not safe.

35.     Shockingly, and as described below, while some of the Automakers have instituted Auto-Off in *newer* vehicles, they have failed to rectify *older* model vehicles with a basic software update that would provide a permanent Auto-Off remedy for this Defect. And, Toyota Group has failed to warn owners, lessees, and drivers of its Affected Vehicles of the deadly safety risk of the Defect.

---

[19] *See* **Exhibit 1** (delineating which makes and models have Keyless Fobs as standard equipment [with the additional technological costs built into the vehicles' sale price] and in which makes, models and trims Keyless Fobs are optional).

36.     As a result of Toyota Group's material omissions regarding the Defect, Plaintiffs were harmed and suffered actual damages. Plaintiffs have purchased or leased Affected Vehicles that they would not otherwise have purchased or leased, or would have paid less for had they known of the Defect.

37.     Absent relief from the Court, Plaintiffs and Class Members who drive their Affected Vehicles must also risk serious injury or death associated with the Defect.

38.     Due to the technological nature of the Affected Vehicles, Plaintiffs and Class Members have no ability to rectify the Defect by any means, including through independent auto repair shops. The programing of the Affected Vehicles and the Keyless Fobs are controlled by Toyota Group's proprietary software. In short, Plaintiffs and Class Members are unable on their own to cure the Defect through any means. The risk associated with the Defect is therefore capable of repetition at any time. Toyota Group is the only party that can institute Auto-Off in its respective Affected Vehicles.

## II.     PARTIES

### A.     Plaintiffs

39.     All Plaintiffs have been harmed, including purchasers and lessees of Affected Vehicles. First, Plaintiffs have each inadvertently left the Affected Vehicles' engines running, and therefore have experienced the Defect first-hand. Second, Plaintiffs overpaid for the purchased or leased Affected Vehicles since the cost of the defective Keyless Fobs was included in the vehicle's price. Third, because defective vehicles are worth less than vehicles without defects, Plaintiffs' Affected Vehicles have diminished in value.

#### 1.     California

##### a.     Plaintiff Richard Draeger

40.     Plaintiff Richard Draeger is, and at all times relevant to this Complaint was, a citizen and resident of California.

41.     Plaintiff purchased a 2011 Toyota Prius, a Toyota Group vehicle, without knowledge of the Defect in 2011 at Elk Grove Toyota in Elk Grove, California.

42.     Plaintiff paid approximately $30,000 for his vehicle.

43.     Plaintiff's vehicle bears the VIN # JTDKN3DUOB1403319.

44.     Plaintiff's vehicle is an Affected Vehicle.

45.     Plaintiff purchased the Toyota Prius primarily for personal, family, and household use.

46.     Prior to purchasing the vehicle, Plaintiff reviewed marketing materials from Ford Group, including:

(a)     Toyota's/manufacturer's sales brochures for the vehicle;

(b)     Toyota's/manufacturer's television advertisements for the vehicle; and

(c)     Toyota's/manufacturer's advertisements in an automotive magazine for the vehicle.

(d)     Third-party sources such as car magazines about the vehicle.

47.     None of Toyota Group's pre-sale materials reviewed by Plaintiff contained any information that his vehicle lacked Auto-Off, or that the lack of Auto-Off poses a serious safety risk.

48.     A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Richard Draeger, includes the sales brochure. The sales brochure for Plaintiff's 2011 Toyota Prius is attached as **Exhibit 4**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

49.     On two occasions, Plaintiff inadvertently left the vehicle running even after removing the Keyless Fob. On the first occasion, Plaintiff parked the vehicle in the driveway in the evening and removed the Keyless Fob, only to discover that the engine was still running the next morning. On the second occasion, Plaintiff

1   parked the vehicle in the garage and removed the Keyless Fob, only to discover

2   that the engine was still running two hours later. For both incidents, Plaintiff could

3   not hear the engine running given the quiet nature of the Prius.

4         50.    In light of these incidents, Plaintiff is now concerned about the lack of

5   Auto-Off in the vehicle.

6         51.    Plaintiff Richard Draeger, at the time of his purchase and at the time

7   of the incidents stated herein, did not know that Auto-Off was an available

8   technology that would have remedied the Defect and removed the risk of deadly

9   safety consequences.

10         52.    Plaintiff's injury and risk of future harm is capable of repetition

11   because he is powerless and technically unable to institute Auto-Off in his vehicle;

12   only Toyota Group can install and implement Auto-Off in his vehicle. Plaintiff

13   therefore is realistically threatened by a repetition of the Defect because Plaintiff

14   intends to continue to drive his vehicle as his primary mode of vehicular

15   transportation.

16         53.    Toyota Group's omission of information about the Defect was

17   material because Plaintiff Richard Draeger would not have purchased or would

18   have paid less for the vehicle had he known of the Defect prior to purchase.

19         54.    Plaintiff would have paid less for the vehicle because he paid extra for

20   a vehicle equipped with a Keyless Fob more costly than a traditional Physical Key.

21   The additional price paid for the Affected Vehicle that lacks Auto-Off was passed

22   on from the Toyota Group to consumers, including Plaintiff. Plaintiff has therefore

23   conferred a benefit to the Toyota Group.

24         **b.**    **Plaintiffs Stanley and Janet Neill (Joint Owners)**

25         55.    Plaintiffs Stanley and Janet Neill are, and at all times relevant to this

26   Complaint were, citizens and residents of California.

27

28

---

56.   Plaintiffs jointly purchased a 2014 Lexus RX350, a Toyota Group vehicle, without knowledge of the Defect on or about December 5, 2013 at Jim Falk of Beverly Hills Lexus in Beverly Hills, California.

57.   Plaintiffs paid approximately $48,795.71 for their vehicle.

58.   Plaintiffs' vehicle bears the VIN # JTJZK18AXE2010119.

59.   Plaintiffs' vehicle is an Affected Vehicle.

60.   Plaintiffs purchased the Lexus RX350 primarily for personal, family, and household use.

61.   Prior to purchasing the vehicle, Plaintiff reviewed marketing materials from Toyota Group, including:

(a)   Toyota Group's/manufacturer's sales brochure for the vehicle,

(b)   Toyota Group's/manufacturer's television advertisements for the vehicle,

(c)   Toyota Group's/manufacturer's newspaper advertisements for the vehicle, and

(d)   Third-party sources such as a Consumer Reports article on the vehicle, which covered the vehicle's safety and reliability.

62.   None of Toyota Group's pre-sale materials reviewed by Plaintiffs contained any information that their vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

63.   A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiffs Stanley and Janet Neill, includes the sales brochure. The sales brochure of Plaintiffs' 2014 Lexus RX350 is attached as **Exhibit 5.** The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

64.   Plaintiffs removed the Keyless Fob from the vehicle on many occasions only to discover that the engine was still running when they returned to the vehicle. This has occurred in their garage and in parking lots.

65.    In light of these incidents, Plaintiffs are now concerned about the lack of Auto-Off in the vehicle.

66.    Plaintiffs Stanley and Janet Neill, at the time of their purchase and at the time of the incidents stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

67.    Plaintiffs' injury and risk of future harm is capable of repetition because they are powerless and technically unable to institute an Auto-Off function in their vehicle; only Toyota Group can institute Auto-Off in their vehicle. Plaintiffs therefore are realistically threatened by a repetition of the Defect because Plaintiffs intend to continue to drive their vehicle as their primary mode of vehicular transportation.

68.    Toyota Group's omission of information about the Defect was material because Plaintiffs Stanley and Janet Neill would not have purchased or would have paid less for the vehicle had they known of the Defect prior to purchase.

69.    Plaintiffs would have paid less for the vehicle because they paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the Toyota Group to consumers, including Plaintiffs. Plaintiffs have therefore conferred a benefit to the Toyota Group.

**c.    Plaintiff Neil Stevens**

70.    Plaintiff Neil Stevens is, and at all times relevant to this Complaint was, a citizen and resident of California.

71.    Plaintiff leased a 2012 Toyota Prius, a Toyota Group vehicle, without knowledge of the Defect in or about August 2012 at Bob Smith Toyota in La Crescenta, California.

72. Plaintiff pays approximately $330 per month for his vehicle lease.

73. Plaintiff's vehicle bears the VIN # JTDKN3DU5C1582944.

74. Plaintiff's vehicle is an Affected Vehicle.

75. Plaintiff leased the Toyota Prius primarily for personal, family, and household use.

76. Prior to lease of the vehicle, Plaintiff reviewed marketing materials from Toyota Group, including:

(a)    Toyota's/manufacturer's television advertisements for the vehicle;

(b)    Toyota's/manufacturer's information about the vehicle as provided on the manufacturer's website regarding the vehicle; and

(c)    Toyota's/manufacturer's advertisements in an automotive magazine.

77. None of Toyota Group's pre-sale materials reviewed by Plaintiff contained any information that his vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

78. A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Neil Stevens, includes the sales brochure. The sales brochure of Plaintiff's 2012 Toyota Prius is attached as **Exhibit 6**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

79. Plaintiff removed the Keyless Fob and parked the vehicle in his driveway. Because the vehicle was silent (as a hybrid running on battery power while stationary) when parked, there was no noticeable "engine" sound. He did not realize the vehicle was left running until he later received a phone call from his neighbors telling him that the vehicle was still running – after the gasoline engine kicked on to regenerate the depleted hybrid battery pack.

80.     In light of this incident, Plaintiff is now concerned about the lack of Auto-Off in the vehicle.

81.     Plaintiff Neil Stevens, at the time of his lease and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

82.     Plaintiff's injury and risk of future harm is capable of repetition because he is powerless and technically unable to institute an Auto-Off function in his vehicle; only Toyota Group can institute Auto-Off in his vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive his vehicle as his primary mode of vehicular transportation.

83.     Toyota Group's omission of information about the Defect was material because Plaintiff Neil Stevens would not have leased or would have paid less for the lease had he known of the Defect prior to the lease.

84.     Plaintiff would have paid less for the vehicle because he paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the Toyota Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the Toyota Group.

**2.     Massachusetts**

      **a.     Plaintiff Patricia Flannery**

85.     Plaintiff Patricia Flannery is, and at all times relevant to this Complaint was, a citizen and resident of Massachusetts.

86.     Plaintiff purchased a 2006 Toyota Prius, a Toyota Group vehicle, without knowledge of the Defect on or about May 18, 2006, at Harr Toyota in Worcester, Massachusetts.

87.     Plaintiff paid approximately $24,000 for her vehicle.

88.    Plaintiff's vehicle bears the VIN # JTDKB20U267074991.

89.    Plaintiff's vehicle is an Affected Vehicle.

90.    Plaintiff purchased the Toyota Prius primarily for personal, family, and household use.

91.    Prior to purchasing the vehicle Plaintiff reviewed marketing materials from Toyota Group, including:

(a)    Toyota Group's/2006 Prius sales brochure; and

(b)    the website for the Toyota Group's 2006 Prius.

92.    None of Toyota Group's pre-sale materials reviewed by Plaintiff contained any information that her vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

93.    A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Patricia Flannery, includes the sales brochure. The sales brochure of Plaintiff's 2006 Toyota Prius is attached as **Exhibit 7**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

94.    On one occasion, Plaintiff removed the Keyless Fob, parked the vehicle, and then returned six hours later to discover that the engine was still running.

95.    In light of this incident, Plaintiff is now concerned about the lack of Auto-Off in the vehicle.

96.    Plaintiff Patricia Flannery, at the time of her purchase and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

97.    Plaintiff's injury and risk of future harm is capable of repetition because she is powerless and technically unable to institute an Auto-Off function in her vehicle; only Toyota Group can institute Auto-Off in her vehicle. Plaintiff

therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive her vehicle as her primary mode of vehicular transportation.

98.     Toyota Group's omission of information about the Defect was material because Plaintiff Patricia Flannery would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

99.     Plaintiff would have paid less for the vehicle because she paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the Toyota Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the Toyota Group.

**3.     New Jersey**

**a.     Plaintiff Helen Ciangiulli**

100.     Plaintiff Helen Ciangiulli is, and at all times relevant to this Complaint was, a citizen and resident of New Jersey.

101.     Plaintiff purchased a 2007 Toyota Avalon Limited, a Toyota Group vehicle, without knowledge of the Defect in or around August, 2007, at Lawrence Lexus in Lawrence Township, New Jersey.

102.     Plaintiff paid approximately $37,000 for her vehicle.

103.     Plaintiff's vehicle bears the VIN # 4T1BK36B97U213752.

104.     Plaintiff's vehicle is an Affected Vehicle.

105.     Plaintiff purchased the Toyota Avalon primarily for personal, family, and household use.

106.     Prior to purchasing the vehicle, Plaintiff reviewed marketing materials from Toyota Group, including: Toyota's/manufacturer's website with information about the vehicle.

107.   None of Toyota Group's pre-sale materials reviewed by Plaintiff contained any information that her vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

108.   A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Helen Ciangiulli, includes the sales brochure. The sales brochure of Plaintiff's 2007 Toyota Avalon Limited is attached as **Exhibit 8**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

109.   On one occasion, Plaintiff drove the vehicle to work, parked the vehicle in the parking lot, and removed the Keyless Fob. When Plaintiff returned to her vehicle approximately eight hours later, the vehicle engine was still running.

110.   In light of this incident, Plaintiff is now concerned about the lack of Auto-Off in the vehicle.

111.   Plaintiff Helen Ciangiulli, at the time of her purchase and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

112.   Plaintiff's injury and risk of future harm is capable of repetition because she is powerless and technically unable to institute an Auto-Off function in her vehicle; only Toyota Group can institute Auto-Off in her vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive her vehicle as her primary mode of vehicular transportation.

113.   Toyota Group's omission of information about the Defect was material because Plaintiff Helen Ciangiulli would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

114.   Plaintiff would have paid less for the vehicle because she paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable

1  vehicle with a traditional Physical Key. The additional price paid for the Affected

2  Vehicle that lacks Auto-Off was passed on from the Toyota Group to consumers,

3  including Plaintiff. Plaintiff has therefore conferred a benefit to the Toyota Group.

4                      **b.**       **Plaintiff Judith Harr Shane**

5       115.   Plaintiff Judith Harr Shane is, and at all times relevant to this

6  Complaint was, a citizen and resident of New Jersey.

7       116.   Plaintiff purchased a 2015 Lexus RX 450h, a Toyota Group vehicle,

8  without knowledge of the Defect on or about May 31, 2014 at Lawrence Lexus in

9  Lawrence Township, New Jersey.

10       117.   Plaintiff paid approximately $62,805 for her vehicle, inclusive of all

11  accessories and warranties.

12       118.   Plaintiff's vehicle bears the VIN # 2T2BC1BA0FC002157.

13       119.   Plaintiff's vehicle is an Affected Vehicle.

14       120.   Plaintiff purchased the Lexus RX 450h primarily for personal, family,

15  and household use.

16       121.   Prior to purchasing the vehicle, Plaintiff reviewed marketing materials

17  from Toyota Group, including:

18            (a)    Toyota's/manufacture's television advertising for the vehicle;

19  and

20            (b)    Toyota's/manufacture's radio adverting for the vehicle.

21       122.   None of Toyota Group's pre-sale materials reviewed by Plaintiff

22  contained any information that her vehicle lacked Auto-Off or that the lack of

23  Auto-Off poses a serious safety risk.

24       123.   A representative example of the pre-sale marketing materials

25  distributed to consumers, like Plaintiff Judith Harr Shane, includes the sales

26  brochure. The sales brochure of Plaintiff's 2015 Lexus RX 450h is attached as

27  **Exhibit 9**. The sales brochure fails to state that the vehicle lacks Auto-Off and that

28  the lack of Auto-Off poses a safety risk.

124.   In one incident, Plaintiff parked the vehicle, removed the Keyless Fob, and then later discovered that the engine was still running when she returned to the vehicle.

125.   In light of this incident, Plaintiff Judith Harr Shane is now concerned about the lack of Auto-Off in the vehicle.

126.   Plaintiff Judith Harr Shane, at the time of her purchase and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

127.   Plaintiff's injury and risk of future harm is capable of repetition because she is powerless and technically unable to institute an Auto-Off function in her vehicle; only Toyota Group can institute Auto-Off in her vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive her vehicle as her primary mode of vehicular transportation.

128.   Toyota Group's omission of information about the Defect was material because Plaintiff Judith Harr Shane would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

129.   Plaintiff would have paid less for the vehicle because she paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the Toyota Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the Toyota Group.

### c.   Plaintiff Steven Green

130.   Plaintiff Steven Green is, and at all times relevant to this Complaint was, a citizen and resident of New Jersey.

131.   Plaintiff leased a 2014 Lexus GX460, a Toyota Group vehicle, without knowledge of the Defect in or about February 2014, Ray Catena Lexus of Monmouth in Oakhurst, New Jersey.

132.   Plaintiff pays approximately $675 per month for his vehicle lease.

133.   Plaintiff's vehicle bears the VIN # JTJBM7FX0E5072284.

134.   Plaintiff's vehicle is an Affected Vehicle.

135.   Plaintiff leased the Lexus GX460 primarily for personal, family, and household use.

136.   Prior to leasing the vehicle, Plaintiff reviewed marketing materials from Toyota Group, including:

>           (a)      Toyota's/manufacturer's sales brochures for the vehicle;

>           (b)      Toyota's/manufacturer's advertisements throughout the dealership floor space for the vehicle; and

>           (c)      Toyota's/manufacturer's television advertisements for the vehicle.

137.   None of Toyota Group's pre-sale materials reviewed by Plaintiff contained any information that his vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

138.   A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Steven Green, includes the sales brochure. The sales brochure of Plaintiff's 2014 Lexus GX460 is attached as **Exhibit 10**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

139.   Plaintiff parked the vehicle, removed the Keyless Fob, and then later discovered that the engine was still running when he returned to the vehicle.  On a separate occasion, this occurred in his garage, and only discovered that it continued to run hours later.

140.   In light of these incidents, Plaintiff is now concerned about the lack of Auto-Off in the vehicle.

141.   Plaintiff Steven Green, at the time of his lease and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

142.   Plaintiff's injury and risk of future harm is capable of repetition because he is powerless and technically unable to institute an Auto-Off function in his vehicle; only Toyota Group can institute Auto-Off in his vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive his vehicle as his primary mode of vehicular transportation.

143.   Toyota Group's omission of information about the Defect was material because Plaintiff Steven Green would not have leased or would have paid less for the vehicle had he known of the Defect prior to purchase.

144.   Plaintiff would have paid less for the vehicle because he paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the Toyota Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the Toyota Group.

**B.    Defendant**

    **1.    Toyota Group**

        **a.    Toyota**

145.   Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a Delaware corporation whose principal place of business is 19001 South Western Avenue, Department WC11, Torrance, CA 90501.

146.   TMS's address for customer complaints is 19001 South Western Avenue, Department WC11, Torrance, CA 90501. TMS's registered agent for

service of process is Toyota Motor Sales, U.S.A., Inc., c/o CT Corporation System, 818 W. Seventh St. 2nd Fl., Los Angeles, CA 90017.

### b.   Lexus

147.   Lexus vehicles are universally manufactured, marketed, and distributed by TMS.

148.   Moreover, Lexus has the same registered agent for service of process in the United States as TMS.

### c.   The Toyota Group

149.   TMS, through its various entities, designs, manufactures, markets, distributes and sells Toyota and Lexus automobiles in California and multiple other locations in the United States and worldwide.

150.   Collectively, the Defendant TMS and its Lexus brand are herein referred to as the "Toyota Group."

151.   Each of Toyota Group's Keyless Fob systems work in substantially the same if not identical manner across all of the Affected Vehicles that the Toyota Group produces.

### 2.   Other Automotive Groups

152.   Although this Complaint is brought solely against the Toyota Group, numerous other Automakers have instituted Keyless Fobs in their vehicles.[20] The following is a list of Automakers that have implemented Keyless Fobs and, though not named in this Complaint, are referenced throughout because of Toyota Group's knowledge of these other Automakers' actions (and inactions):

(a)   the "Ford Group," comprised of Ford Motor Company, which designs, manufactures, markets, distributes and sells Ford- and Lincoln-branded automobiles in the U.S.;

---

[20] For the full list of all Affected Vehicles for each Automaker Group, *see* **Exhibit 1**.

(b)   the "Nissan Group," comprised of Nissan North America, Inc., which designs, manufactures, markets, distributes and sells Nissan- and Infiniti-branded automobiles in the U.S.;

(c)   the "Honda Group," comprised of American Honda Motor Co., Inc., which designs, manufactures, markets, distributes and sells Honda- and Acura-branded automobiles in the U.S.;

(d)   the "FCA Group," comprised of FCA US LLC, which designs, manufactures, markets, distributes and sells Chrysler-, Jeep-, Dodge-, and RAM-branded automobiles in the U.S.;

(e)   the "GM Group," comprised of General Motors Company, which designs, manufactures, markets, distributes and sells GMC-, Chevrolet-, Cadillac-, and Buick-branded automobiles in the U.S.;

(f)   the "BMW Group," comprised of BMW of North America, LLC, which designs, manufactures, markets, distributes and sells BMW- and Mini-branded automobiles in the U.S.;

(g)   the "VW Group," comprised of Volkswagen Group of America, Inc., which designs, manufactures, markets, distributes and sells Volkswagen- and Audi-branded automobiles in the U.S.;

(h)   the "MB Group," comprised of Mercedes-Benz USA, LLC, which designs, manufactures, markets, distributes and sells Mercedes Benz-branded automobiles in the U.S.; and

(i)   the "Hyundai/Kia Group," comprised of Hyundai Motor America, Inc. and Kia Motors America, Inc., which collaborate and design, manufacture, market, distribute and sells Hyundai- and Kia-branded automobiles in the U.S.

### III.   JURISDICTION

153.   Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

154.   This is a class action. Some of the members of the proposed Plaintiff Class are citizens of states different from the Automakers' home states.

155.   Upon information and belief, aggregate claims of individual Class Members exceed $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2).

156.   The number of members of all proposed plaintiff classes in the aggregate is 100 members or greater. *See* 28 U.S.C. § 1332(d)(5)(B).

## IV.   VENUE

157.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

158.   Toyota Group is deemed to reside in this district pursuant to 28 U.S.C. § 1391(c), so personal jurisdiction is appropriate.

159.   In addition, a substantial part of the events or omissions giving rise to these claims occurred in this district.

160.   The California-resident plaintiffs' Venue Declarations pursuant to Cal. Civ. Code § 1780(d) are attached hereto as **Exhibits 17 through 19**.

## V.   FACTUAL ALLEGATIONS

161.   Plaintiffs bring this action for themselves and on behalf of all Class Members. Plaintiffs are informed and believe that, because of the Defect—the lack of Auto-Off in the Affected Vehicles—all such Affected Vehicles have a dangerous propensity to cause carbon monoxide poisoning, placing Plaintiffs and the Class Members at undue risk of suffering physical injury and death due to carbon monoxide poisoning. This risk of imminent injury is caused by the Defect in conjunction with Toyota Group's failure to provide warnings about the Defect in pre-sale materials, and/or supply funds to retrofit and/or repair the dangerously defective Affected Vehicles, and/or buy back the Affected Vehicles.

162.   Affected Vehicles at issue in this action are described in detail in **Exhibit 1**. Toyota Group can readily ascertain and identify all Affected Vehicles by Vehicle Identification Number ("VIN") and/or specification sheets to discern

1  which Affected Vehicles were optioned with or had the Keyless Fob as standard
2  equipment. Department of Motor Vehicle registries readily identify those with
3  Affected Vehicles.

4       163.   Plaintiffs reserve the right to amend the definition and list of Affected
5  Vehicles should further discovery reveal that additional models, model-years, and
6  model variations and trim levels are affected by the Defect.

7  **A.    The Keyless Fob**

8       164.   Over the past decade, an increasing number of vehicles in the United
9  States are being sold with Keyless Fobs. Keyless Fobs function without ever
10  touching the vehicle (e.g., the Keyless Fob can remain in the driver's pocket or
11  purse throughout operation of the vehicle).

12       165.   Affected Vehicles with Keyless Fobs have several features that
13  differentiate them from vehicles that use Physical Keys. First, vehicles with
14  Keyless Fobs have a "Start/Stop" button on the dashboard, center console, or
15  shifter mechanism, rather than an ignition slot that accepts a Physical Key that is
16  used to start the engine. Second, the Affected Vehicles have a transponder (the
17  Keyless Fob) that contains the circuitry that sends an electronic signal, rather than
18  a conventional Physical Key with teeth.

19       166.   Toyota Group sells vehicles in the United States that are equipped
20  with Keyless Fobs. As noted in **Exhibit 1**, though each of the Automakers name
21  the Keyless Fobs using various catch-phrases such as "Intelligent Keys" or
22  "SmartAccess," the Keyless Fobs are functionally the same when it comes to this
23  Complaint's allegations regarding the Defect and the lack of Auto-Off.

24       167.   Over the years, the makes and models of automobiles with Keyless
25  Fobs have risen dramatically:

26

27

28



Sources: Edmunds.com

168.   As noted, over the course of decades, drivers have associated the presence of the Physical Key with the operation of the vehicle's engine. Each of the Automaker Groups' Keyless Fobs has significantly altered the driver behavior required to turn the vehicle on and off.

169.   Toyota Group has failed to take into account the monumental shift of user behavior required when moving from a Physical Key, when the engine is *always* off if the Physical Key is removed, to a Keyless Fob, which has *nothing* to do with turning off the engine.

170.   As noted in the treatise "The Safety Promise and Challenge of Automotive Electronics" published by the National Research Council of the National Academies in 2012,[21]

> A further challenge in today's electronics-intensive vehicle relates to the interactions between the driver and the vehicle. As electronics-driven systems with new

_____

[21] Transportation Research Board, National Research Council of the National Academies (2012), http://www.omg.org/hot-topics/documents/Safety-Promise-and-Challenge-of-Automotive-Electronics-TRB-2012.pdf (last visited Nov. 12, 2015) (emphasis added).

behaviors and interfaces are introduced at a faster pace, the driving experience can change, and some drivers may be surprised by certain vehicle behaviors that are normal for the new system. The unfamiliar driver may respond in a way that causes safety problems. Similarly, a startled or stressed driver may not react properly when faced with an unexpected condition. **For example, the means for shutting off the engine while driving when a vehicle has a keyless ignition system (push button) has been suspected to be misunderstood by drivers accustomed to the traditional keyed ignition switch.** Thus, human factors, which have always been important in the design of vehicles, will grow in significance as new systems affecting the driver's interfaces and interactions with the vehicle are introduced.[22]

171.   An August, 2011, Department of Transportation publication pointed to the disconnect that occurs when there is a change to engrained routine behaviors:

> **Whenever a special situation requires an operator to perform a rarely-used procedure to achieve a result normally reached through a familiar procedure, there is a chance that the mind will slip into the familiar procedure. especially if fear, distraction, and/or fatigue are also present.** For example, flight instructors have noted that pilots who are in transition training from one aircraft type to another will sometimes use procedures appropriate to their previous aircraft, even after they have already passed a test demonstrating knowledge of the correct procedures for the new aircraft. This phenomenon is particularly likely to occur in moments of very high mental workload. The terms 'habit-pattern errors' and 'reversion of habituated behaviors' are used to describe this experience.[23] (Emphasis added.)

172.   And an even earlier publication in February, 2006, from the United Kingdom's Transport Research Laboratory entitled "Design Guidelines For Safety of In-Vehicle Information Systems" explains that its "recommendations [are] to

---

[22] *Id.* at 64-65.

[23] United States Department of Transportation, Research and Innovative Technology Administration, R*eview of SAE RP J2948 JAN2011: Keyless Ignition Control Design* (August 2011), at 2-3 (emphasis added).

assist designers, manufacturers, suppliers and installers regarding safety-related issues affecting systems used by drivers in-transit."[24] The publication overviews key human factors design considerations. Specifically, the publication states:

> Another safety concern for IVIS [in-vehicle information systems] is behavioural adaptation; as drivers become more familiar and experienced with a particular system they may adapt / modify the way in which they interact with it and the information it provides.
>
> The Organisation for Economic Co-operation and Development (OECD, 1990), refers to behavioural adaptation as those " ... behaviours which may occur following the introduction of changes to the road-vehicle-user system and which were not intended by the initiators of the change". **Designers should consider that potential safety benefits and behavioural impact of new in-vehicle systems may be reduced by behavioural adaptation**; for example, drivers may consider using route guidance systems to help them find their way in fog when without the IVIS they would not travel.
>
> In this context the more advanced and sophisticated the system - and the more useful information it offers the driver - the more such adaptation and reliance will become a factor. The only effective way of assessing - or evaluating - such concerns are by instigating long-term trials.[25]

173. Upon information and belief, Toyota Group regularly reviews publications related to automotive safety, especially as it pertains to in-vehicle information systems and human interactions with each of the Automaker's systems. Thus, Toyota Group had actual knowledge of the dangerous safety risks associated with changes to in-vehicle information systems – including the shift from the Physical Key to the Keyless Fob.

---

[24] A. Stevens, A. Quimby, A. Board, T. Kersloot, and P. Burns, *Design Guidelines For Safety of In-Vehicle Information Systems*. Transport Research Laboratory, at 6, http://www.transport-research.info/Upload/Documents/200607/20060728_165141_88073_UG340_Final_Report.pdf (last visited Nov. 12, 2015).

[25] *Id.* at 38 (emphasis added).

**B.     Without Auto-Off, Keyless Fobs Lead to Carbon Monoxide Poisoning**

174.   Unfortunately and inexplicably, Toyota Group has failed to implement an updated safety feature to prevent the Defect in its Affected Vehicles. In these vehicles, a driver may place the car into park but may inadvertently fail to turn off the Affected Vehicle's engine. The Defect exists because the Affected Vehicle can emit dangerous (if not deadly) levels of carbon monoxide, especially if left running in an enclosed environment, such as an attached garage.

175.   In some instances, the engine may continue to run *even if the driver pushes the Start/Stop button*. For example, in a recent recall, the Ford Group recalled 432,096 vehicles, including the 2015 model year Escape, Focus, and C-Max models equipped with Keyless Fobs because, according to the official recall report:[26]

> **Description of the Noncompliance:** On your vehicle, it may be possible for the engine to continue to run after turning the ignition key to the "off" position and removing the key (vehicles with standard ignition keys), or after pressing the Engine Start/ Stop button (vehicles with push-button start and intelligent access keys).

176.   In other words, because of software glitches that affected nearly one-half of one-million vehicles, depressing the "Start/Stop" button failed to turn off the engine as the manufacturer had intended.

177.   Although all of the makes/models of automobiles listed in **Exhibit 1** have Keyless Fobs, upon information and belief (and based on counsel's review of the thousands of pages of over 1,500 pre-sale brochures), *none* have Auto-Off. As a result, in just the past five years, at least 14 people have died and many more have been seriously injured, requiring hospitalization due to carbon monoxide poisoning.

---

[26] Non-Compliance Notice, July 1, 2015, www.nhtsa.dot.gov, http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM481952/RCLRPT-15V436-2235.PDF.

**C.    Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through News Reports of Injuries and Deaths**

178.    A detailed investigation by counsel has uncovered news reports describing deaths and injuries from the Defect.[27]

179.    To date in 2015 alone, several people have died or have been seriously injured from carbon monoxide poisoning caused by the Defect:

(a)    On or about April 12, 2015, in Mooresville, North Carolina, several household members woke up vomiting and had to be hospitalized for carbon monoxide poisoning after a Keyless Fob-equipped Nissan Murano continued to run for over 10 hours in the garage. "[H]er vehicle does shut off after 15 minutes, but only if [it is started via a remote start system]. That's not the case, though, if she starts it with the start button.";[28]

(b)    On or about April 24, 2015, a man was found unconscious in his townhome from carbon monoxide poisoning caused by an Affected Vehicle. Fortunately, his neighbor discovered and rescued him and was able to prevent his untimely death. "The injured man was in serious condition when the fire department took him to [the hospital].";[29]

(c)    Rina and Pasquale Fontanini returned to their home in their 2013 Lincoln MKS. The couple parked their car in the attached garage and either inadvertently forgot to shut down the engine or pushed the Start/Stop button in an effort to do so. The couple then entered their home, but unbeknownst to them the car engine continued to run. Their house filled with deadly carbon monoxide and

---

[27] For example, one recent article provides a chart of the documented deaths and injuries caused by the Defect. *See* Fleischer, *supra.*

[28] WBTV, *Keyless ignition cars linked to carbon monoxide poisoning,* www.wbtv.com (April 12, 2015), http://www.wbtv.com/story/28473481/keyless-ignition-cars-linked-to-co-poisoning (last visited Aug. 5, 2015).

[29] Sun-Sentinel, *Carbon monoxide detector saves lives in apartment complex,* Sun-Sentinel.com (April 24, 2015), http://www.sun-sentinel.com/local/broward/fort-lauderdale/fl-lauderdale-carbon-monoxide-rescue-20150424-story.html (last visited Aug. 5, 2015).

both Rina and Pasquale were later found dead the next day by their son, a lieutenant in the Highland Park Fire Department.[30] On August 20, 2015, the executrix of the Fontanini's estate filed a wrongful death lawsuit against Ford Motor Company, Lincoln Motor Company, and Libertyville Lincoln Sales, Inc., alleging strict liability arising out of the keyless ignition defect;[31]

(d)     On or about June 18, 2015, a Berkeley Heights, New Jersey man died and his wife was left unconscious when their Affected Vehicle continued to run after the driver exited the vehicle;[32]

(e)     On September 6, 2015, a Boynton Beach, Florida resident died after her Affected Vehicle continued to run in the garage;[33]

(f)     On October 31, 2015, a mother, Constance Petot returned from a long day at work to her parents' home in the Jacksonville, Florida area, and parked her vehicle in the attached garage. She believed that she had pressed the Start/Stop button in her vehicle to turn off the engine, she closed the garage door, and she went into the house. In the middle of the night, her 13-month-old son woke up screaming. Constance knew something was wrong when she started feeling dizzy and her son went limp in her arms. After walking downstairs, Constance discovered that the vehicle engine was still running. She and her son both received emergency medical treatment, and she subsequently learned that the level of

---

[30] *Carbon Monoxide Death Prompts Questions About Keyless Auto Ignitions*, *supra*.

[31] *Manfredini v. Ford Motor Co. See also McCoppin, supra*.

[32] Suzanne Russell, *Carbon monoxide fumes kill Berkeley Heights man*, MY CENTRAL JERSEY(June 18, 2015), http://www.mycentraljersey.com/story/news/local/union-county/2015/06/18/elderly-berkeley-heights-man-dies-apparent-exposure-co-fumes/28925991/ (last visited Aug. 5, 2015).

[33] Palm Beach Post, *Suburban Boynton carbon monoxide death prompts awareness campaigns*, www.mypalmbeachpost.com (Sept. 30, 2015), http://www.mypalmbeachpost.com/news/news/local/suburban-boynton-carbon-monoxide-death-prompts-awa/nnrZM/ (last visited Oct. 1, 2015).

carbon monoxide in the house was high enough to have killed both her and her son if they had remained in the house for only twenty additional minutes;[34] and

(g)      On November 7, 2015, in Issaquah, Washington, firefighters were summoned by a neighbor to a household of six, which included two grandparents, two parents, and two children – one child under 10 years old and the other a 17-month-old baby.[35] The father had come home from work and believed he had pressed the Start/Stop button in his Toyota Sienna vehicle to turn off the engine. The Toyota Sienna is an Affected Vehicle. Despite the fact that the family's house had carbon monoxide detectors on every floor, none of the alarms alerted the family to the danger.[36] As a result, all six family members plus three of the first-responder firefighters suffered from carbon monoxide poisoning and required hospitalization.[37] The neighbor's call could have been too late, though – the Toyota Sienna minivan fortunately ran out of gas before it could emit enough carbon monoxide to kill everyone in the household.[38] The 17-month-old baby was hospitalized and treated in a hyperbaric chamber with oxygen therapy for three days.[39]

180.   More deaths and injuries were also reported between 2010 and 2014:

(a)      A woman was found dead in her townhome and her boyfriend was found "clinging to life" when the woman's Lexus with a Keyless Fob continued to run in the garage of the woman's home;[40]

---

[34] Fleischer, *supra*.
[35] Guerrero, *supra*.
[36] Kim, *supra*.
[37] Garnick, *supra*.
[38] *Issaquah family poisoned by carbon monoxide is back home*, *supra*.
[39] *Issaquah family treated for carbon monoxide poisoning; Fumes entered the home*, *supra*.
[40] WMAR, *A warning about keyless ignitions*, www.abc2news.com (June 27, 2011), http://www.abc2news.com/news/local-news/investigations/a-warning-about-keyless-ignitions (last visited Aug. 5, 2015).

(b)     On June 6, 2013, Bill and Eugenia Thomason returned to their home in Greenville, South Carolina, and parked their 2005 Toyota Avalon, equipped with a Keyless Fob, in the attached garage. After exiting the car, Mrs. Thomason had no idea that the vehicle's engine was still running, particularly because Toyota designed the vehicle to run quietly. The couple closed the garage and entered their home, never realizing that the vehicle engine was emitting deadly carbon monoxide into the home. The next day, the couple did not show up at church, and their friends grew worried. The police were called to the house and found the Thomasons "face-up", barely breathing in their bed. EMS was called, and the couple was rushed to Greenville Memorial Hospital in an effort to save their lives. Despite several days of treatment, Bill and Eugenia both suffered brain injuries and ultimately died in the hospital;[41]

(c)     A Weymouth, Massachusetts couple and their two grandchildren all became ill and had to be hospitalized after their Keyless Fob-equipped Lexus ES350 caused carbon monoxide poisoning;[42]

(d)     A couple from Manchester, Missouri died after their Keyless Fob-equipped vehicle continued to run in their garage;[43]

(e)     A Lancaster Township, Pennsylvania couple died from carbon monoxide poisoning after their Affected Vehicle continued to run in their garage;[44]

---

[41] The State, *Accident likely caused Greenville couple's deaths, police say,* www.thestate.com (June 19, 2013), http://www.thestate.com/news/local/article14434898.html (last visited Aug. 5, 2015).

[42] WCVB, *Couple, kids hospitalized after car left running in Weymouth garage,* www.wcvb.com (April 22, 2014), http://www.wcvb.com/news/couple-kids-hospitalized-after-car-left-running-in-weymouth-garage/25597062 (last visited Aug. 5, 2015).

[43] Betsey Bruce, *Elderly couple found dead in Manchester home,* FOX2now.com. (May 17, 2014), http://fox2now.com/2014/05/17/elderly-couple-found-dead-in-manchester-home/ (last visited Aug. 5, 2015).

[44] Cindy Stauffer, *Forgetting to turn off your car: Carbon monoxide deaths happen in Lancaster County, and across the country,* Lancasteronline.com (May 7, 2014), http://lancasteronline.com/news/local/forgetting-to-turn-off-your-car-

*(continued)*

1       (f)    In Boca Raton, Florida, a 29-year-old woman died of carbon

2  monoxide poisoning caused by her Keyless Fob-equipped 2006 Lexus;[45] and

3       (g)    In Boca Raton, Florida, a couple died when their Keyless Fob-

4  equipped Mercedes-Benz continued to run.[46] Mort Victor and his girlfriend, Adele

5  Ridless, were found dead in their bed upstairs after the house filled with deadly

6  levels of carbon monoxide from their Affected Vehicle parked in their garage. The

7  couple had just returned from dinner at a nearby seafood restaurant and had packed

8  their bags for a flight the next day from Fort Lauderdale to San Francisco. The

9  couple's friends came to the door the next morning but, despite knocking on the

10  door many times, no one answered. The police investigation revealed that the

11  couple's Mercedes vehicle—equipped with a Keyless Fob—had been running in

12  the garage overnight, filling the house with deadly fumes. In response to this

13  publicized case, Mercedes commented that it "believe[s] Keyless Go to be a safe

14  system."[47]

15       181.   While counsel uncovered the above-referenced news stories

16  concerning the Defect during their pre-suit investigation, counsel believe that the

17  number of deaths and injuries are likely far greater than reported because only

18  some deaths are reported in the media, and even when deaths are reported, a cause

19  of death is often not provided or known.

20

21

22  *(continued)*
   carbon-monoxide-deaths-happen/article_40e8f97e-d602-11e3-a66e-
23  0017a43b2370.html (last visited Aug. 5, 2015).
   [45] Sun-Sentinel, *Investigation into carbon monoxide death near Boca Raton*
24  *includes keyless car,* (September 1, 2010), http://articles.sun-sentinel.com/2010-
   09-01/news/fl-carbon-monoxide-keyless-20100831_1_carbon-monoxide-
25  electronic-fob-auto-safety-experts (last visited Aug. 5, 2015).
   [46] Sun-Sentinel, *Keyless Mercedes linked to carbon monoxide poisoning in West*
26  *Boca, authorities say,* www.sun-sentinel.com (March 16, 2012), http://articles.sun-
   sentinel.com/2012-03-16/news/fl-carbon-monoxide-cars-20120313_1_carbon-
27  monoxide-keyless-ignition-keyless-systems (last visited Aug. 5, 2015).
   [47] *Id.*
28

182.   Upon information and belief, Toyota Group regularly reviews news stories that affect its public image, especially news stories about each of the Automaker's vehicular safety. Thus, Toyota Group has (and had) actual knowledge of all of the above-referenced news stories concerning deaths and injuries that resulted from the lack of Auto-Off.

**D.   Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Recalls**

183.   On Friday, March 13, 2015, Chevrolet, a GM Group vehicle brand, issued an official recall of all 2011, 2012 and 2013 model year Chevrolet Volt range-extended electric cars[48] to address an issue with the car's on-board software that allowed its gasoline engine to operate for extended periods of time while parked but unintentionally left powered on. According to official NHTSA recall documents,[49] the GM Group itself estimated that "100%" of the 50,236 Chevrolet Volts were plagued by this defect, noting the following:

> **Description of the Safety Risk:** If the gas engine runs for long periods of time within an enclosed space, such as a garage, carbon monoxide could build up in the enclosed space and potentially cause injury.

> **Description of the Cause:** The 2011-2013 MY Volt vehicles were not equipped with software that automatically shuts off a vehicle after a predetermined amount of time. This software was deployed starting with the 2014 MY [Model Year] Volt vehicles and beyond.

---

[48] Range extended electric vehicles are <u>not</u> pure electric vehicles. Rather, "range extenders," as they are known in the industry, rely primarily on the electric battery pack for shorter travel periods but rely on a separate conventional gasoline engine to continuously regenerate the battery pack when the battery depletes, or for more extended driving distances. In other words, range extended electric vehicles are the same as conventional gasoline automobiles when it comes to Plaintiffs' claims as stated herein. Range extended electric vehicles, just like conventional gasoline automobiles, have a gas combustion engine to recharge the battery, and they emit harmful levels of carbon monoxide without Auto-Off.

[49] NHTSA Safety Recall 14617: *Defect Notice report*, www.nhtsa.dot.gov, http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

The recall itself was not a prolonged, difficult process. To the contrary, vehicle dealers simply had to reprogram the cars via a software update taking just 30 minutes per vehicle. Dealers were reimbursed $4.78 per vehicle for the reprogramming.[50]

184.   The GM Group admitted in its recall of the 2011-2013 Chevrolet Volts that: 1) Keyless Fobs pose a safety risk because "carbon monoxide could build up in [an] enclosed space,"[51] and 2) the vehicles could be modified to cure the Defect with a simple software update costing less than $5.00 per vehicle and taking just 30 minutes of dealership time per vehicle.

185.   Despite the fact that the GM Group implemented this remedy for the 2011-2013 Chevrolet Volts, it has failed to do so for *any* of its other Affected Vehicles that have the *exact same* Defect.

186.   Upon information and belief, Toyota Group regularly reviews recalls, including the above-referenced recall, by competitor Automakers, and it too has (and had) actual knowledge of the Defect that exists in the absence of Auto-Off.

**E.    Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Automaker Patent Applications**

187.   Both the GM Group and the Ford Group have patented or have sought to patent the very Auto-Off systems that would prevent the Defect.

188.   On May 20, 2013, the GM Group filed for a patent (issued on March 17, 2015, under patent number 8,983,720) to address the Defect.[52] GM's patent, which was granted, explicitly addressed the concerns (and relief requested) that

---

[50] NHTSA Safety Recall 14617: *Remedy Instructions and TSB*, www.nhtsa.dot.gov, http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM476093/RCRIT-15V145-6506.pdf.

[51] NHTSA Safety Recall 14617: *Defect Notice report*, www.nhtsa.dot.gov, http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

[52] *See* **Exhibit 11**.

Plaintiffs and the Class seek here. Specifically, the patent seeks to avoid the situation wherein the "engine may have been errantly left running, in which case the vehicle sends a notice to the user[, and i]f no response [from the user] is received [then] the vehicle can activate the engine kill device and stop the engine."[53] The patent acknowledges that a "vehicle operator may unintentionally leave a motor vehicle engine running … [which can] contribute to an accumulation of exhaust gas if not properly ventilated, such as in some garages." Moreover, the patent includes "one or more carbon monoxide (CO) sensors" so that the vehicle can "indicate [if] exhaust fumes are present at dangerous levels."[54] The GM Group has (and had) actual knowledge of the inherent dangers of not including Auto-Off (and the Defect that would otherwise result) well in advance of its May 20, 2013, patent application filing.

189.   Similarly, on November 1, 2011, the Ford Group filed for a patent, application number 2013/0110374, to address the Defect.[55] The patent application explicitly addresses the concerns (and relief requested) that Plaintiffs and the Class seek here. Specifically, the patent application seeks to avoid the situation wherein "a vehicle operator may unintentionally leave the vehicle with the engine idling," which is common because "engine technology that have made vehicle engines quieter further increase the likelihood that a vehicle operator may leave the vehicle with the engine running."[56] Thus, Ford's patent application proposes a method whereby the "vehicle control systems may be configured to automatically shut down an idling engine, for example, upon the elapse of a specified duration of idling time."[57] Moreover, the patent application specifically anticipates a situation

---

[53] *Id.*
[54] *Id.*
[55] *See* **Exhibit 12**.
[56] *Id.*
[57] *Id.*

1  in which the vehicle is left "in a substantially enclosed space, such as an indoor

2  garage, [then] the vehicle control system may automatically shut down the idling

3  engine in anticipation of the operator not returning to the vehicle imminently."[58]

4  Thus, the Ford Group has (and had) actual knowledge of the inherent dangers of

5  not including Auto-Off (and the Defect that would otherwise result) well in

6  advance of its November 1, 2011, patent application filing.

7          190.   Upon information and belief, Toyota Group regularly reviews patents

8  by competitor Automakers, and thus it had actual knowledge of the Defect that

9  exists in the absence of Auto-Off as a result of the GM and Ford Group patents.

10 **F.    Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Third-Party Patent Applications**

12         191.   Upon information and belief, Toyota Group regularly reviews patents

13 pertaining to the automotive industry and safety. There are, at a minimum, four

14 issued or pending patents for Auto-Off systems or mechanisms dating back to

15 November 16, 2007, in addition to the applications submitted by the Ford Group

16 and the GM Group discussed above.

17         (a)    Patent number 7,650,864, applied for on November 16, 2007,

18 by Magna Electronics Inc. and issued on January 26, 2010, concerns remote

19 starting systems on cars and a built-in Auto-Off system to prevent the Defect.

20 Magna Electronics described its proposed technology in the patent: "Since vehicles

21 typically exhaust carbon monoxide and carbon dioxide emissions during operation

22 of the engine, and since such emission buildup in an enclosed environment can be

23 dangerous, the remote starter control module preferably provides one or more

24 safety measures or features to reduce or mitigate any potential CO/CO2 buildup in

25 situations where the vehicle may be parked in an enclosed environment."[59]

26

27 [58] *Id.*

28 [59] *See* **Exhibit 13**.

(b)      Patent application number 2012/0130604, filed on November 21, 2011, by Michael W. Kirshon, *et al.*, calls for "a series of sensors installed within a vehicle to monitor functions to determine if a vehicle engine is running and there is a potential for toxic exhaust gases to accumulate, creating a toxic environment."[60] In other words, this patent describes an Auto-Off system to prevent the Defect. Patent application number 2012/0130604 describes the Defect associated with the Affected Vehicles as follows:

> Combustion engines discharge an exhaust that includes toxic gases, such as carbon monoxide. It is well known that elevated levels of carbon monoxide gases contained within a closed space can have harmful and even fatal effects on individuals exposed to higher concentrations thereof.

> Numerous occurrences have been noted where residential occupants have succumbed to toxic exhaust gases discharged by a running vehicle engine, where the vehicle was parked within an attached garage. Several advancements in vehicle technology are aggravating the potential issue. For example, keyless engine control systems allow an operator to leave the vehicle while the engine remains running. Until recently, all vehicle engines would initiate operation by inserting a key into an ignition switch, whereby removing the key causes the engine to cease operating. The vehicle key would commonly be stored on a key ring used to hold a series of keys. The operator commonly uses other keys to access buildings, offices, desks, residence, etc. An operator who forgets to remove the keys from the vehicle would be reminded the next time a key stored on the same key ring would be needed. Furthermore, vehicle engines are now much quieter, making people less aware that the engine is running. In addition, vehicles now commonly include remote starters, where an individual can start a vehicle's engine remotely. This can occur by accidentally depressing the remote start button, thereby starting the vehicle engine unbeknownst to the individual.[61]

---

[60] *See* **Exhibit 14**.
[61] *Id.*

Patent application 2012/0130604 thus proposes to patent a system whereby a series of sensors "automatically disables or turns off the ignition of the vehicle engine to cease the generation of the toxic exhaust gases."[62]

(c)     Patent number 8,825,224, applied for on March 26, 2012, by Directed, LLC and issued on September 2, 2014, concerns "[a]n automated vehicle shutdown and user notification method and device for shutting down an engine in a vehicle having a passive keyless entry and start ignition system where the engine has unintentionally been left running by the user is disclosed."[63] In the relevant part, patent number 8,825,224 describes the Defect associated with the Affected Vehicles as follows: "Long term idling of the engine within a confined space, such as within a garage attached to a dwelling, can lead to a rise in carbon monoxide levels that might potentially cause asphyxiation, brain damage or death to individuals exposed to high concentrations of carbon monoxide inside the dwelling."[64]

(d)     Patent number 8,977,476, applied for on August 14, 2012, by Safety Shutdown, LLC and issued on March 10, 2015, concerns "[a] system for automatically shutting down an engine of a motor vehicle" taking into account multiple variables, including an Auto-Off timer, carbon monoxide sensing ability, and a driver's potential override request.[65] The background section of Safety Shutdown, LLC's patent duplicated in full Michael W. Kirshon, *et al.*'s patent application number 2012/0130604 regarding why such a safety mechanism is paramount, i.e., that engine idling can cause deadly levels of carbon monoxide can spread to the dwelling and cause serious injury and death. In short, Safety Shutdown, LLC's patent covers the exact Defect as described herein.

---

[62] *Id.*
[63] *See* **Exhibit 15**.
[64] *Id.*
[65] *See* **Exhibit 16**.

192.   Upon information and belief, Toyota Group reviews patents that may have an effect on the technology in the Affected Vehicles, and thus it too had actual knowledge of the Defect that exists in the absence of Auto-Off as a result of these third-party patents.

**G.   Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Personal Injury Lawsuit Filings**

193.   Some of the Automakers have faced personal injury and wrongful death lawsuits as a result of the Defect, but instead of instituting Auto-Off in the Affected Vehicles, these Automakers have quietly settled the suits behind confidentiality agreements, thereby concealing the risks of the Defect. On November 1, 2010, Myrna and Donato Pastore filed a wrongful death lawsuit against Toyota for the death of Ernest Codelia, Jr.[66] The Amended Complaint states that Mr. Codelia died of carbon monoxide poisoning caused by his 2008 Lexus EX 350, which was equipped with a Keyless Fob.[67] Toyota insisted that the settlement be under seal, and thus there are no publicly available documents or information as a result of this suit.[68]

194.   In a related suit, filed by Mary Rivera on October 29, 2010, against Toyota, she alleges that she collapsed and was found barely breathing as a result of carbon monoxide poisoning caused by her 2008 Lexus EX 350, which was equipped with a Keyless Fob and continued to run after the driver left the vehicle.[69] Ms. Rivera is a former college professor who now suffers from permanent brain damage as a result of the carbon monoxide poisoning. Though Ms. Rivera survived the incident, her partner Ernest Cordelia, Jr., died—as noted in the paragraph

---

[66] *Socorro v. Toyota Motor N. Am., Inc.*, No. 1:10-cv-05020, ECF No. 1 (E.D.N.Y. Nov. 1, 2010).

[67] *Id. at ECF No. 11.*

[68] *See id.,* at ECF Nos. 53, 54 (joint letter stating that Toyota insisted on full confidentiality, even though safety concerns were at issue).

[69] *Rivera v. Toyota Motor*, ECF No. 13.

immediately above—with 65 percent carbon monoxide poisoning in his blood, according to an autopsy report. This case was settled and closed on October 1, 2014; the settlement was also finalized under seal.[70]

195.   On April 1, 2011, Linda Bloom and Rachelle Brown filed a wrongful death action against Toyota for the death of their father, Meyer Michael Yaffe, who died on December 30, 2010, as a result of carbon monoxide poisoning from his 2009 Lexus EX 350, which was equipped with a Keyless Fob.[71]

196.   On June 14, 2011, Kimberlin Nickles filed a wrongful death action against Toyota for the death of her 29-year-old daughter, Chastity Glisson, who died on August 26, 2010, as a result of carbon monoxide poisoning from her 2006 Lexus IS 250, an Affected Vehicle.[72] Chastity Glisson parked her Lexus in the garage. Later that night, she collapsed in the third-floor bathroom. Her boyfriend, Timothy Maddock, discovered her body and tried to help her, but then he too succumbed to the carbon monoxide that had by then filled the house and lost consciousness. Tragically, neither Ms. Glisson nor Mr. Maddock was found until the next day. By then, 29-year-old Chastity Glisson had died, and Timothy Maddock was critically injured and required hospitalization for ten days. An investigation revealed that the carbon monoxide that killed Ms. Glisson and severely injured Mr. Maddock came from the Lexus in the garage, which was equipped with a Keyless Fob and, unbeknownst to the occupants of the home, continued to run after the driver exited the vehicle.[73]

---

[70] *Id. at ECF Nos. 64 and 65.*
[71] *Bloom v. Toyota Motor N. Am., Inc.*, No. BC458715 (Cal. Sup. Ct., Cty. of Los Angeles 2011).
[72] *Nickles v. Gables Constr.*
[73] *Id.*

197.   On December 30, 2014, William Thomason, Jr. filed a wrongful death action against Toyota for the death of relatives, Bill and Eugenia Thomason.[74] On June 6, 2013, Bill and Eugenia Thomason returned to their home in Greenville, South Carolina, and parked their 2005 Toyota Avalon, equipped with a Keyless Fob, in the attached garage. After exiting the car, Mrs. Thomason had no idea that the vehicle's engine was still running, particularly because Toyota designed the vehicle to run quietly. The couple closed the garage and entered their home, never realizing that the vehicle engine was emitting deadly carbon monoxide into the home. The next day, the couple did not show up at church, and their friends grew worried. The police were called to the house and found the Thomasons "face-up", barely breathing in their bed. EMS was called, and the couple was rushed to Greenville Memorial Hospital in an effort to save their lives. Despite several days of treatment, Bill and Eugenia both suffered brain injuries and ultimately died in the hospital.

198.   On August 20, 2015, the family of Rina and Pasquale Fontanini filed a wrongful death action against Ford.[75] On June 14, 2015, Rina and Pasquale Fontanini returned to their home in their 2013 Lincoln MKS. The couple parked their car in the attached garage and either inadvertently forgot to shut down the engine or pushed the Start/Stop button in an effort to do so. The couple then entered their home, but unbeknownst to them the car engine continued to run. Their house filled with deadly carbon monoxide and both Rina and Pasquale were later found dead the next day by their son, a lieutenant in the Highland Park Fire Department.[76] On August 20, 2015, the executrix of the Fontanini's estate filed a wrongful death lawsuit against Ford Motor Company, Lincoln Motor Company,

[74] *Thomason v. Toyota Motor Eng'g & Mfg. N. Am. Inc.*, No. 6:14-cv-04895 (D.S.C. 2014).

[75] *Manfredini v. Ford Motor Co.*

[76] *Carbon Monoxide Death Prompts Questions About Keyless Auto Ignitions*, *supra*.

1    and Libertyville Lincoln Sales, Inc., alleging strict liability arising out of the

2    keyless ignition defect.

3          199.   Upon information and belief, Toyota Group regularly reviews

4    lawsuits filed against itself and against competitor Automakers pertaining to

5    automotive safety. Thus, Toyota Group was aware not only of suits in which it was

6    named as a defendant, if any, but also of suits concerning death or injury caused by

7    the Defect filed against other Automakers.

8    **H.    Toyota Group has (and had) Actual Knowledge of the Dangerous
            Carbon Monoxide Poisoning Consequences of Vehicles with Keyless
9          Fobs that lack Auto-Off through Information in the NHTSA Complaint
            Database**

10         200.   Toyota Group readily has access to all NHTSA complaints pertaining

11   to both its own manufactured vehicles as well as any other Automakers'

12   automobiles. Upon information and belief, Toyota Group regularly reviews

13   NHTSA complaints pertaining to both itself, as well as its competitor Automakers,

14   to ensure internal quality and safety compliance. There have been, at a minimum,

15   35 formally-filed NHTSA complaints about the Defect. Attached as **Exhibit 2** is a

16   list of 35 complaints lodged with the NHTSA by consumers about Defect incidents

17   associated with Keyless Fobs. For example, and as listed in chronological order:

18         (a)    On April 6, 2009, a person with a Toyota Group vehicle, a 2008

19   Lexus LS460, filed NHTSA complaint number 10264229, stating:

20                COMPLAINT REGARDING DANGER OF DEATH
                  DUE TO CARBON MONOXIDE. THIS CAR IS
21                KEYLESS WHICH OFTEN RESULTS IN THE
                  FAILURE OF THEIR DRIVER SHUTTING OFF THE
22                ENGINE WHICH IS AT TIMES PARKED INSIDE AN
                  ENCLOSED   GARAGE   OF   A   HOME.   THIS
23                OCCURRED ON THREE DIFFERENT OCCASIONS
                  AT MY HOME. THANK GOD I HAD A CARBON
24                MONOXIDE ALARM IN MY HOME WHICH
                  ALERTED ME OF THIS PROBLEM. LEXUS
25                SHOULD HAVE INSTALLED SOME SORT OF
                  SWITCH WHICH WOULD AUTOMATICALLY
26                SHUT OFF THE ENGINE WHEN THE DRIVER SEAT
                  HAS BEEN UNOCCUPIED FOR FIFTEEN MINUTES.
27                **LEXUS STATES THEY HAVE RECEIVED MANY
                  COMPLAINTS THROUGHOUT THE COUNTRY,**

28

**HOWEVER THERE IS NOTHING THEY CAN DO ABOUT THIS PROBLEM AND DANGER. EXISTING CARS SHOULD BE RECALLED AND REPAIRED AND THIS SHOULD BE MANDATORY FOR ALL FUTURE CARS WITH A KEYLESS SYSTEM.**[77]

(b)     On May 4, 2009, a person with a Nissan Group vehicle, a 2009 Nissan Murano S, filed NHTSA complaint number 10267647, stating:

[MY CAR] COMES WITH PUSH BUTTON "START/STOP" ENGINE […] THE DANGER IS WHEN YOU PARK THE CAR IN YOUR GARAGE...AND FORGET TO PUSH THE START/STOP BUTTON TO TURN THE ENGINE OFF... BECAUSE THIS TECHNOLOGY IS NEW, THE INSTINCT IS TO PULL THE KEY FOB OUT AND GET OUT OF THE CAR... THE ENGINE REMAINS ON AND IT IS QUIET ENOUGH THAT YOU DO NOT NOTICE THE ENGINE RUNNING... THE DANGER IS THAT CARBON MONOXIDE CAN FILL UP YOUR GARAGE AND HOUSE AND KILL THE INHABITANTS... I CONTACTED NISSAN VIA EMAIL. THEY HAD A TECH. REVIEW MY COMPLAINT AND RESPONDED AS FOLLOWS "DON'T FORGET TO PUSH THE BUTTON TO TURN THE ENGINE OFF"... **OBVIOUSLY [NISSAN] DO[ES] NOT GET THE DANGER**.[78]

(c)     On February 3, 2010, a person with a Nissan Group vehicle, a Nissan Altima, filed NHTSA complaint number 10304356, stating:

[I] WOULD LIKE TO BRING TO YOUR ATTENTION A DEFECT THAT I BELIEVE NEEDS TO BE CORRECTED IN AT LEAST SOME, IF NOT ALL, OF NISSAN, LATEST ALTIMA VEHICLES. THE PROBLEM OCCURS WHEN THE CAR IS LEFT RUNNING AND THE VEHICLE DOORS ARE CLOSED WITH THE REMOTE "KEYLESS". THIS PROBLEM COULD CREATE A SERIOUS SAFETY & HEALTH ISSUE IF A DRIVER FORGETS TO SHUT OFF THE ENGINE BEFORE USING THE REMOTE KEY TO CLOSE THE VEHICLE DOORS.[79]

---

[77] **Exhibit 2** at 25 (emphasis added).
[78] *Id.* at 26 (emphasis added).
[79] *Id.* at 24.

(d)     On February 9, 2010, a person with a Toyota Group vehicle, a 2009 Toyota Camry Hybrid, filed NHTSA complaint number 10308004, stating:

> SAFETY HAZARD!. 2009 TOYOTA CAMRY (LIKELY ALL HYBRID AUTOMOBILES) WILL CONTINUOUSLY RESTART THE GAS ENGINE TO RECHARGE THE BATTERY IF THE IGNITION SYSTEM IS NOT TURNED OFF WHEN DEPARTING THE VEHICLE. IF THE AUTO IS IN AN ATTACHED GARAGE THIS COULD RESULT IN ACCIDENTAL CO POISONING TO OCCUPANTS WITHIN THE DWELLING. I HAVE OBSERVED A HYBRID CONTINUOUSLY RESTARTING WHILE PARKED IN THE DRIVEWAY. THIS CAR IS USUALLY KEPT IN AN ATTACHED GARAGE. THE OWNER FORGOT TO TURN OFF THE IGNITION UPON LEAVING THE CAR. THIS IS LIKELY A COMMON EVENT. THIS WILL EVENTUALLY RESULT IN SERIOUSLY INJURY OR DEATH, AND MAY HAVE ALREADY HAPPENED AND NOT BEEN PROPERLY IDENTIFIED AND REPORTED.[80]

(e)     On April 28, 2010, a person with a Toyota Group vehicle, a 2007 Lexus LS460, filed NHTSA complaint number 10326861, stating:

> I ARRIVED HOME AFTER DINNER […] CLOSED THE GARAGE DOOR AND, LEAVING THE KEY FOB INSIDE THE VEHICLE, I ENTERED MY HOME AND EVENTUALLY WENT TO SLEEP. I WAS AWOKEN AT APPROX. 2:15AM BY A CARBON MONOXIDE ALARM LOCATED IN THE FOYER INSIDE MY HOME ADJACENT TO THE ENTRANCE TO THE GARAGE. I ENTERED THE GARAGE TO DISCOVER THAT THE CAR'S ENGINE WAS STILL RUNNING, THE GARAGE FILLED WITH NOXIOUS FUMES, AND THE ENTIRE VEHICLE EXTREMELY HOT TO TOUCH, INSIDE AND OUT. I OPENED THE GARAGE DOOR AND WAS EVENTUALLY ABLE TO SHUT DOWN THE ENGINE AND CLEAR OUT THE FUMES. AS I SEE IT, THE FAILURE HERE WAS TWO-FOLD: (1) WHEN I OPENED MY DOOR TO EXIT THE CAR, NO ALARM OR OTHER SOUND ALERTED ME THAT THE ENGINE WAS STILL RUNNING, AS IS THE CASE WITH IGNITIONS REQUIRING KEYS. THIS IS PARTICULARLY PROBLEMATIC BECAUSE THE **CAR'S ENGINE RUNS IN VIRTUAL SILENCE**; AND (2) EVEN

---

[80] *Id.* at 5.

AFTER THE CAR WAS UNWITTINGLY LEFT IDLING WHILE IN PARK, **THE ENGINE DID NOT CUT OFF AFTER SOME PREDETERMINED PERIOD OF TIME**. I SPOKE TO MY LOCAL LEXUS DEALER, WHO SUGGESTED THAT I CONTACT LEXUS USA DIRECTLY. […] **AFTER BEING TOLD BY LEXUS THAT THEY SEE NO PROBLEMS WITH THEIR KEYLESS IGNITION SYSTEM, I ELECTED TO TAKE ANOTHER APPROACH AND CONTACT NHTSA. […] LEXUS HAS TAKEN NO RESPONSIBILITY FOR THIS INCIDENT WHICH NEARLY KILLED ME AND WHICH COULD KILL OTHERS, AND OFFERS NO SOLUTIONS OR FIXES TO THIS PROBLEM**.[81]

(f)     On May 28, 2010, a person with a Toyota Group vehicle, a 2009 Toyota Highlander Hybrid, filed NHTSA complaint number 10332639, stating:

OUR GARAGE IS ATTACHED TO OUR HOUSE WITH OUR BEDROOM ABOVE THE GARAGE. WITH 3 KIDS, BOTH MY WIFE AND I HAVE BEEN DISTRACTED LEAVING THE CAR IN THE GARAGE TO UNLOAD GROCERIES OR HELP THE CHILDREN. WHEN ON ELECTRIC POWER WE HAVE NEGLECTED TO TURN OFF THE IGNITION **SINCE THE [HYBRID] CAR IS SILENT [WHILE PARKED]**. ONLY WHEN THE CARBON-MONOXIDE DETECTOR SOUNDED IN OUR GARAGE DID WE REALIZE THE ENGINE HAD STARTED WHILE WE WERE IN THE HOUSE. WE THINK THIS COULD BE DEADLY TO OTHER FAMILIES WITHOUT CARBON MONOXIDE ALARMS WHO MAY ALSO FORGET TO TURN OFF THE ENGINE WHEN PARKED IN AN ATTACHED GARAGE WHILE ON ELECTRIC POWER.[82]

(g)     One death was associated with a Toyota Group vehicle, described in NHTSA complaint number 10375730, filed on January 5, 2011:

ON THE EVENING OF DECEMBER 13, 2010, VICTIM LEFT HIS CAR RUNNING IN HIS GARAGE. THE CAR HAS A "SMART KEY" WHICH IS A REMOTE KEY-FOB. THIS MEANS THAT HE DOES NOT HAVE TO TURN A KEY TO TURN THE

---

[81] *Id.* at 23 (emphasis added).

[82] *Id.* at 22 (emphasis added).

IGNITION ON AND OFF. INSTEAD, THE CAR TURNS ON AND OFF BY PRESSING THE SAME BUTTON ON THE DASH BOARD. HE MUST HAVE FORGOTTEN TO TURN THE CAR OFF. HE THEN WENT TO SLEEP AND SUFFERED CARBON MONOXIDE POISONING DURING THE NIGHT. HE WAS FOUND UNCONSCIOUS ON THE FLOOR THE NEXT MORNING. THE CAR WAS STILL RUNNING. THE VICTIM WAS TAKEN TO THE HOSPITAL, WHERE HE IS IN THE ICU AND SEDATED.[83]

(h)     One injury and one death associated with a Toyota Group vehicle, a 2006 Lexus IS 250, were described in NHTSA complaint number 10380153, filed on February 3, 2011:

A YOUNG LADY PARKED HER 2006 IS 250 LEXUS, EQUIPPED WITH A "SMART KEY" SYSTEM, IN HER ATTACHED GARAGE WHICH WAS ON THE GROUND FLOOR OF HER THREE STORY TOWNHOUSE. SHE EXITED THE VEHICLE WITH THE "KEY FOB" ON HER PERSON, BUT EITHER INADVERTENTLY FORGOT TO SHUT DOWN THE ENGINE OR PUSHED THE START BUTTON IN AN EFFORT TO DO SO BUT WAS UNSUCCESSFUL. THE YOUNG LADY DID NOT REALIZE THE VEHICLE WAS RUNNING AND AFTER ENTERING HER TOWNHOUSE FROM THE GARAGE PLACED THE "KEY FOB" ON A TABLE ON THE SECOND FLOOR. THE YOUNG LADY REMAINED IN HER TOWNHOUSE WITH THE VEHICLE RUNNING IN THE GARAGE UNTIL IT RAN OUT OF GASOLINE AND STOPPED. THE YOUNG LADY WAS SUBSEQUENTLY FOUND DEAD IN HER BATHROOM ON THE THIRD FLOOR. THE DEATH WAS DETERMINED TO HAVE BEEN CAUSED BY CARBON MONOXIDE POISONING AS A RESULT OF THE VEHICLE HAVING BEEN LEFT RUNNING IN THE GARAGE. THE VEHICLE LACKED A "SHUT-DOWN" SWITCH TO SHUT THE ENGINE OFF WHEN UNOCCUPIED AND INERT FOR AN INTERVAL OF TIME AND/OR LACKED AN ADEQUATE AURAL WARNING THAT THE "KEY FOB" WAS BEING REMOVED FROM THE VEHICLE WHILE IT WAS RUNNING OR THE OPERATOR

---

[83] *Id.* at 21.

HAD EXITED THE VEHICLE WHILE THE ENGINE WAS RUNNING.[84]

(i)     Two injuries were associated with a person with a Toyota Group vehicle, a 2011 Toyota Camry XLE, described in NHTSA complaint number 10394590, filed on March 20, 2011:

> MY WIFE AND I ARE RETIRED IN FLORIDA. WE PARKED OUR 2011 TOYOTA CAMRY XLE WITH KEYLESS IGNITION IN OUR GARAGE AND BROUGHT THE KEY FOB WITH US INTO OUR HOME. MY WIFE EITHER DID NOT PUSH THE ENGINE OFF BUTTON HARD ENOUGH OR FORGOT TO PUSH THE ENGINE OFF BUTTON TO TURN OFF THE ENGINE. WE DID NOT HEAR THE 3 SHORT BEEPS TELLING US THE ENGINE WAS RUNNING AND THE KEY FOB WAS REMOVED FROM THE VEHICLE. THE GARAGE IS ATTACHED TO OUR HOME. THE VEHICLE WAS LEFT RUNNING IN OUR CLOSED GARAGE. CARBON MONOXIDE FUMES ENTERED OUR HOME CAUSING HEADACHES, NAUSEA, AND LETHARGY. OUR HOME CARBON MONOXIDE DETECTOR SOUNDED AN ALARM. WE INVESTIGATED AND FOUND THAT WE LEFT THE VEHICLE RUNNING IN THE GARAGE FOR 90 MINUTES. THE GARAGE TEMPERATURE WAS OVER 100(F) DEGREES. […] WE WERE SICKENED BY THE CARBON MONOXIDE FUMES AND CAME CLOSE TO LOSING OUR LIVES. THE KEYLESS IGNITION OPTION IS TOO DANGEROUS. **THERE NEEDS TO BE A CHANGE IN DESIGN THAT TURNS OFF THE ENGINE WHEN THE KEY FOB LEAVES THE VEHICLE AND THE ENGINE OFF BUTTON IS NOT DEPRESSED**.[85]

(j)     On June 10, 2011, a person with a GM Group vehicle, a 2011 Cadillac SRX, filed NHTSA complaint number 10405921, stating:

> ON THE 2011 CADILLAC SRX THERE IS NO WARNING SOUNDED IF YOU LEAVE YOUR KEYLESS IGNITION RUNNING AND LEAVE THE VEHICLE. YESTERDAY, I INADVERTENTLY LEFT THE VEHICLE RUNNING AND **THE CAR DID NOT BEEP OR GIVE ME ANY INDICATION THAT I**

---

[84] *Id.* at 20.
[85] *Id.* at 19 (emphasis added).

**HAD DONE SO**. THESE KEYLESS IGNITION SYSTEMS ARE VERY DANGEROUS BECAUSE IF YOU ACCIDENTALLY LEAVE THE CAR RUNNING IN THE GARAGE YOU COULD INADVERTENTLY CAUSE A CARBON MONOXIDE POISONING SITUATION. IT IS A VERY UNSAFE FEATURE THAT COULD BE CORRECTED WITH A SIMPLE WARNING SIGNAL. THERE NEEDS TO BE SOME TYPE OF WARNING, A CAR HORN BEEP OR SOMETHING TO LET THE DRIVER KNOW THAT THE VEHICLE IS RUNNING WHEN THE DRIVER LEAVES THE VEHICLE.[86]

(k)     On November 29, 2011, a person with a Toyota Group vehicle, a 2010 LEXUS RX 450h, filed NHTSA complaint number 10437757, stating:

HYBRID VEHICLE + KELSEY [sic, KEYLESS] IGNITION = DEADLY COMBINATION. WE ACCIDENTALLY LEFT OUR 2010 LEXUS RX 450H IN THE GARAGE WITH THE IGNITION "ON" AND TURNED IN FOR THE NIGHT. **SINCE IT IS A HYBRID, IT MAKES NO SOUND - EVEN WHEN "RUNNING".** SO WE WERE UNAWARE THE IGNITION WAS STILL ON. MUCH LATER IN THE EVENING, AFTER THE BATTERY HAD DEPLETED, THE GAS ENGINE CAME ON, FILLING OUR GARAGE WITH CARBON MONOXIDE. HAD I NOT GONE BACK OUT TO RETRIEVE SOMETHING FROM THE GARAGE AND NOTICED THAT BY THIS TIME THE CAR'S GAS ENGINE WAS RUNNING, I LIKELY WOULDN'T BE WRITING THIS E-MAIL. THIS IS A VERY DANGEROUS FLAW IN AN OTHERWISE GREAT CAR. THE TINY RED VS. GREEN LED ON THE IGNITION BUTTON IS NOT ENOUGH INDICATION THAT THE CAR IS RUNNING. AN AUDIBLE ALARM OR SOME TYPE OF POSITIVE INTERLOCK IS NEEDED.[87]

(l)     On August 17, 2012, a person with a GM Group vehicle, a Chevrolet Volt, filed NHTSA complaint number 10471278, stating:

THERE IS AN APPARENT DESIGN FLAW IN THE CHEVY VOLT RELATED TO AN INDIVIDUAL EXITING THE VEHICLE WITHOUT POWERING DOWN THE SYSTEMS WHICH COULD RESULT IN CO POISONING OR DEATH AND POSSIBLE FIRE

---

[86] *Id.* at 18 (emphasis added).
[87] *Id.* at 17 (emphasis added).

HAZARDS IN THE RIGHT SITUATION. THE VOLT USES A KEY FOB SYSTEM AND PUSH BUTTON START. KEY FOBS ARE ALREADY PROVING TO BE A SAFETY ISSUE. WITH THE VOLT, THE SITUATION IS EXACERBATED. SINCE THE CAR IS VIRTUALLY SILENT, IT IS VERY EASY FOR A PERSON TO FORGET TO TURN OFF THE CAR, AND WHEN THEY EXIT, **THE LACK OF ANY ENGINE NOISE** WILL OFTEN NOT GIVE THEM THE CUES NECESSARY TO REALIZE THEIR MISTAKE. WHEN THE INDIVIDUAL LEAVES THE CAR POWERED ON, THE BATTERY WILL DRAIN. WHEN THE BATTERY IS SUFFICIENTLY DRAINED, AN ENGINE WILL TURN ON AND CHARGE THE BATTERIES. THIS IS SIGNIFICANT, BECAUSE THIS WILL LIKELY HAPPEN SOMETIME AFTER A PERSON HAS PARKED THEIR CAR. THE RESULT WILL BE A GARAGE FILLING WITH CO FUMES. THE VOLT WILL CONTINUE TO RUN THE ENGINE, IN CYCLES, UNTIL THERE IS NO MORE GAS IN THE TANK. WHILE THERE HAVE ALREADY BEEN DEATHS ASSOCIATED WITH NON-ELECTRIC VEHICLES EQUIPPED WITH KEY FOBS AND CO POISONING AS THE RESULT OF THE DRIVER FORGETTING TO TURN THE CAR, THIS IS GOING TO BE MUCH MORE COMMON IN ELECTRIC HYBRID VEHICLES. **IN AN UNSCIENTIFIC POLL CONDUCTED ON GM-VOLT.COM, OF 100 RESPONDENTS, 30% ADMITTED TO FORGETTING TO TURN THEIR VEHICLE OFF**. ONE USER ON THE SITE FORGOT TO TURN THE VEHICLE OFF, AND ENTERED THE GARAGE SOMETIME LATER TO FIND IT FILLED WITH FUMES. THERE NEEDS TO BE PASSIVE (HORN SIGNALS UPON EXIT) OR ACTIVE (WELL ENGINEERED AUTO SHUTOFF) SYSTEMS PUT IN PLACE TO PREVENT A TRAGEDY.[88]

(m)   One injury was reported associated with a person with a Toyota Group vehicle, a 2011 Lexus ES350, described in NHTSA complaint number 10458009, filed on May 10, 2012:

CONTACT OWNS A …2011 LEXUS ES350. THE CONTACT STATED THAT THE DRIVER EXITED THE VEHICLE AND FORGOT TO SHUT THE IGNITION OFF. THE VEHICLE WAS EQUIPPED

---

[88] *Id.* at 4 (emphasis added).

WITH A PUSH TO START AND STOP FEATURE. THE ENGINE CONTINUED TO RUN UNTIL A CARBON MONOXIDE DETECTOR SOUNDED. THE DRIVER SUFFERED CARBON MONOXIDE POISONING AND AS A RESULT, WAS TAKEN TO A HOSPITAL TO TREAT THE CONDITION.[89]

(n)     One death was reported associated with a person with a Toyota Group vehicle, a 2006 Toyota Avalon, described in NHTSA complaint number 10497402, filed on February 11, 2013:

CONSUMER STATED HER PARENTS PURCHASED A NEW VEHICLE BACK IN 2006. THE VEHICLE CAME EQUIPPED WITH A KEYLESS REMOTE STARTING SYSTEM. ALL IT TOOK, WAS TO HAVE THE DEVICE IN ONES POCKET AND HER FATHER COULD GET IN THE VEHICLE, PRESS A BUTTON AND THE VEHICLE WOULD START UP. WHEN HER FATHER ARRIVED AT HIS DESTINATION, ALL HE HAD TO DO WAS, PUT THE VEHICLE IN PARK, PRESS THE REMOTE BUTTON AND THE ENGINE WOULD SHUT OFF. ON JUNE 28, 2012, WHEN THE CONSUMERS FATHER RETURNED HOME, HE PARKED THE VEHICLE IN THE GARAGE AND WENT IN THE HOUSE. HOURS LATER, THE CONSUMERS FATHER WAS FOUND DECEASED IN THE HOUSE FROM CARBON MONOXIDE POISONING. […] AFTER HER DAD TOOK HIS PACKAGES OUT OF THE CAR AND INTO THE HOUSE, HE CLOSED THE GARAGE, AND NEVER SHUT OFF THE REMOTE STARTER BUTTON. FROM MORNING ALL THROUGH THE DAY, CARBON MONOXIDE SLOWLY SEEPED IN THE KITCHEN WHERE THE GARAGE WAS ATTACHED, THROUGH THE KITCHEN AND INTO THE DEN WHERE HER DAD WAS SITTING. **THE CONSUMER STATED HAD THERE BEEN AN AUTOMATIC SHUT OFF SYSTEM THAT ACTIVATED AFTER A PRESET TIME, WHEN THERE WAS NO WEIGHT IN THE DRIVER'S SEAT, MUCH LIKE THE AIR BAGS ON THE PASSENGER SIDE, THIS SENSELESS TRAGEDY WOULD HAVE NEVER OCCURRED**.[90]

---

[89] *Id.* at 16.
[90] *Id.* at 14 (emphasis added).

(o)     On April 5, 2013, a person with a Nissan Group vehicle, a Nissan Altima, filed NHTSA complaint number 10507204, stating:

> I WAS DRIVING A BRAND-NEW, NISSAN ALTIMA RENTAL CAR ON A BUSINESS TRIP. AFTER I RETURNED TO MY HOTEL ONE AFTERNOON, I FORGOT TO TURN THE ENGINE OFF. THIS VEHICLE HAS A KEY FOB AND A "START/STOP" BUTTON ONLY. THERE IS NO METAL KEY. AFTER I EXITED THE VEHICLE, I NOTICED THAT THE HORN DID NOT HONK WHEN I LOCKED THE VEHICLE WITH THE KEY FOB. THE TRUNK RELEASE DID NOT AUTOMATICALLY OPEN WHEN I USED THE KEY FOB. I MANUALLY PRESSED A BUTTON UNDER THE TRUNK LID TO RETRIEVE MY BAG. THE NEXT MORNING, I NOTICED STEAM AND WATER COMING OUT OF THE EXHAUST TAILPIPES. (IT WAS APP. 34 DEGREES THAT MORNING.) I DISCOVERED THAT THE ENGINE WAS STILL RUNNING, AND THE CAR USED APP[ROXIMATELY] 3/8S OF A TANK OF GASOLINE OVERNIGHT. MY CONCERN IS THAT A CAR LIKE THIS COULD BE DRIVEN INTO A GARAGE WITH THE ENGINE LEFT ON, AND THEN THE OCCUPANTS OF THE RESIDENCE COULD GET CARBON MONOXIDE POISONING FROM THE EXHAUST FUMES. THIS VEHICLE NEEDS SOME TIME [sic, KIND] OF WARNING BELL, CHIME, ETC. TO REMIND THE DRIVER THAT THE ENGINE IS STILL RUNNING IF THEY OPEN THE DRIVER'S SIDE DOOR AND/OR EXIT THE VEHICLE.[91]

(p)     On July 19, 2013, a person with a Toyota Group vehicle, a 2012 Toyota Camry, filed NHTSA complaint number 10525838, stating:

> AT LEAST FOUR OCCASIONS THE MOTOR HAS REMAINED RUNNING AFTER I LEFT THE CAR....THIS CAR HAS PUSH BUTTON IGNITION....DID I NOT TURN IF OFF PROPERLY OR IS THERE A SYSTEM MALFUNCTION....I PARK MY CAR IN AN ATTACHED GARAGE TO OUR HOUSE AND THE DOOR TO OUR HOUSE FROM THE GARAGE IS LEFT OPEN IN THE SUMMER FOR VENTILATION.....IF THE CAR REMAINED RUNNING UNKNOWN TO US DURING THE NIGHT WE WOULD PERISH FROM THE CARBON

---

[91] *Id.* at 13.

MONOXIDE FUMES....I FEEL THIS IS A SAFETY ISSUE THAT NEEDS TO BE ADDRESSED BY TOYOTA, IF NOT ONLY FOR US BUT OTHER TOYOTA CAMRY OWNERS....SO FAR TOYOTA HAS NOT ADDRESSED THIS ISSUE TO OUR SATISFACTION....**IN FACT THE OWNER OF THE DEALERSHIP WHERE WE PURCHASED THE CAR LAUGHED AT OUR SAFETY CONCERN**.....THE ALARM SYSTEM +ON THE CAR IS USELESS AS THE ALARM IS THE SAME WHEN I START THE CAR AS WHEN I STOP THE CAR AND HAVE THE DOOR OPEN OR IF DO NOT TURN OFF THE ENGINE AND GET OUT OF THE CAR AND CLOSE THE DOOR....ALL THESE ALARMS SOUND THE SAME AND MAKE THEM INEFFECTIVE....I HAVE A HEARING PROBLEM RELATED TO EAR SURGERY REPLACING MY BONES OF HEARING BY AN IMPLANT IN MY RIGHT EAR WHICH ALSO MAKES IT HARD FOR ME TO HEAR IF THE ENGINE IS RUNNING OR TURNED OFF.....THE ALARM SYSTEM ON THIS CAR NEEDS TO BE MODIFIED TO ENSURE NOTIFICATION TO THE DRIVER IF THE ENGINE IS RUNNING. ...[92]

(q)     On July 31, 2014, a person with a Nissan Group vehicle filed NHTSA complaint number 10617949, stating:

THIS VEHICLE HAS A PUSH BUTTON ENGINE SHUT OFF BUTTON. I WENT TO A SHOPPING MALL AND FORGOT TO SHUT OFF THE ENGINE. WHEN I RETURNED APPROX. 1 HOUR LATER, THE ENGINE WAS STILL RUNNING. I AM CONCERNED SHOULD THIS HAPPEN WHEN I PARK THE AUTO IN MY CLOSED GARAGE WHICH IS LOCATED DIRECTLY BELOW A BEDROOM. THE ENGINE WILL BE RUNNING ALL NIGHT AND THE BEDROOM WILL BE FILLED WITH CARBON MONOXIDE RESULTING IN DEATH TO THE OCCUPANTS. **THE VEHICLE NEEDS A TIME DELAY SHUT OFF SHOULD THE DRIVER FORGET TO SHUT OFF THE ENGINE. THE TIME DELAY COULD BE SET BY THE MANUFACTURER AND SHOULD BE APPROXIMATELY 15 TO 20 MINUTES**

---

[92] *Id.* at 12 (emphasis added).

**OTHERWISE THE ENGINE WILL RUN FOREVER**.[93]

(r)     On August 12, 2014, a person with an FCA Group vehicle filed NHTSA complaint number 10694821, stating:

> THIS IS A SAFETY CONCERN REGARDING THE ENGINE STARTING/STOP BUTTON WHEN OPERATING THE VEHICLE USING THE START/STOP BUTTON YOU CAN EXIT THE VEHICLE WITH THE ENGINE RUNNING WITHOUT ANY TYPE OF WARNING SIGNAL THAT THE ENGINE IS STILL RUNNING SUCH AS A WARDING [sic, WARNING] CHIME HORN BEEP OR A VIBRATION ON THE KEY FOB. IT IS EASY TO FORGET TO PRESS THE STOP BUTTON WHEN LEAVING THE VEHICLE. AS WE HAVE EXPERIENCED SEVERAL TIMES. THE DANGEROUS CONCERN WITH THIS LACK OF A SAFETY NOTIFICATION IS THE CAR CAN BE LEFT RUNNING IN AN ENCLOSED GARAGE SPREADING DEADLY CARBON MONOXIDE THROUGH A HOME.[94]

(s)     Two injuries were reported associated with a person with a GM Group vehicle, a Chevrolet Volt, described in NHTSA complaint number 10658921, filed on November 18, 2014:

> THE INCIDENT OCCURRED ON 8/27/14, AND RESULTED IN MY WIFE [AND] ME [BEING] TAKEN TO THE HOSPITAL AND TREATED FOR CARBON MONOXIDE POISONING. THE INCIDENT OCCURRED AT OUR HOME. THE VOLT WAS PARKED IN THE ENCLOSED GARAGE ON 8/26 AROUND 7PM. THE 240 VOLT CHARGER WAS PLUGGED IN AS USUAL. I DID NOT NOTICE ANYTHING UNUSUAL AFTER PLUGGING IN THE CHARGER, AND THE VOLT WAS LEFT UNATTENDED UNTIL THE EMS ARRIVED AROUND 11AM THE FOLLOWING DAY. THE EMS PERSONNEL FOUND THE ENGINE RUNNING, VERY HIGH LEVELS OF CO UPON ENTERING THE GARAGE AND EVEN HIGHER LEVELS INSIDE THE CAR. THE INSIDE OF THE PASSAGE COMPARTMENT WAS DESCRIBED AS HOT. THE

---

[93] *Id.* at 11 (emphasis added).
[94] *Id.* at 3.

FRONT EXTERIOR OF THE CAR WAS TO HOT TO TOUCH AND THE CAR REAR WARM. THE TEMPERATURE UNDER THE CAR HOOD WAS DESCRIBED AS "RED HOT". THE ENGINE HAD CONSUMED AROUND 5 GALLONS OF GAS DURING THIS TIME PERIOD. DISTRIBUTION OF THE CO THROUGHOUT THE HOUSE WAS PROBABLY CAUSED BY THE A/C AIR HANDLER WHICH IS LOCATED INSIDE THE GARAGE. … [95]

(t)     Two injuries were reported associated with a person with a Toyota Group vehicle, a 2009 Toyota Camry, described in NHTSA complaint number 10654360, filed on December 2, 2014:

CONSUMER STATED ENGINE DID NOT TURN OFF EVEN AFTER PUSHING THE POWER OFF BUTTON. THE CAR WAS PARKED IN THE GARAGE OVER A PERIOD OF TIME. CONSEQUENTLY, CARBON MONOXIDE ENTERED THE CONSUMER'S HOME. SHE AND HER HUSBAND WENT TO THE HOSPITAL FOR CARBON MONOXIDE POISONING. CONSUMER STATED ENGINE DID NOT TURN OFF EVEN AFTER PUSHING THE POWER OFF BUTTON. THE CAR WAS PARKED IN THE GARAGE OVER A PERIOD OF TIME. CONSEQUENTLY, CARBON MONOXIDE ENTERED THE CONSUMER'S HOME. SHE AND HER HUSBAND WENT TO THE HOSPITAL FOR CARBON MONOXIDE POISONING. … [96]

(u)     Three injuries were reported associated with a person with a GM Group vehicle, a Chevrolet Volt, as described in NHTSA complaint number 10694821, filed on March 17, 2015:

ON MARCH 2, 2015, THREE PEOPLE WENT TO AN EMERGENCY DEPARTMENT (ED) FOR CO POISONING. A 40 YEAR OLD MALE PARKED HIS 2012 CHEVROLET VOLT IN THE GARAGE TO CHARGE (PLUGGED INTO THE OUTLET) AND ACCIDENTALLY LEFT THE CAR RUNNING OVERNIGHT. IN THE MORNING, HE NOTICED THE CAR WAS RUNNING AND HAD SWITCHED TO GASOLINE USE. HE AND HIS TWO CHILDREN

---

[95] *Id.* at 9.
[96] *Id.* at 10.

COMPLAINED OF HEADACHE, WEAKNESS, CHEST PAIN, PALPITATION, AND DIZZINESS. CARBOXYHEMOGLOBIN (COHB) LEVELS WERE >15% FOR ALL THREE INDIVIDUALS. ON MARCH 12, 2015, SEVERAL NEWS MEDIA OUTLETS REPORTED THAT GM IS RECALLING ALL 2011-2013 CHEVROLET VOLTS (ABOUT 64,000) TO INSTALL UPDATES TO PREVENT CO POISONING WHEN THE DRIVER FORGETS TO SHUT OFF THE VEHICLE.[97]

(v)    On March 19, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10695250, stating:

SINCE I LEASED MY CAR IN MAY[ ]2014[.] I FORGOT TO TURN THE ENGINE OFF 4 TIMES. TWICE IT RAN ALL NIGHT IN MY GARAGE BUT FORTUNATELY THE GAS FUMES DID NOT ENTER MY HOUSE WHILE I WAS SLEEPING. […] **I AM ELDERLY AND HARD OF HEARING AND CAN HARDLY HEAR THE ENGINE RUNNING, I WEAR A HEARING AID. IT RUNS VERY QUIETLY.** ONCE I LOANED MY DAUGHTER THE CAR AND SHE ENCOUNTERED THE SAME PROBLEM OF NOT TURNING OFF THE ENGINE, I LEARN FROM INTERNET POST THAT COUNTLESS REPORTS HAVE BEEN MADE AND SEVERAL DEATHS BY CARBON MONOXIDE ENTERING HOMES HAVE OCCURRED DUE TO THIS PROBLEM, I UNDERSTAND THE KEYLESS IGNITION SYSTEM HAS BEEN AROUND FOR MANY YEARS AND IS INSTALLED IN MANY DIFFERENT VEHICLES, I WAS NOT AWARE OF IT UNTIL I GOT MY CAR. I FEEL A SAFETY RECALL SHOULD BE ISSUED TO CORRECT THE PROBLEM BEFORE MORE PEOPLE GET KILLED, THE PUBLIC SHOULD BE MADE AWARE OF IT WITHOUT FURTHER DELAY SINCE COUNTLESS REPORTS HAVE ALREADY BEEN MADE.[98]

(w)    On April 28, 2015, a person with an FCA Group vehicle filed NHTSA complaint number 10713276, stating:

ON THE KEYLESS START SYSTEM THERE IS NO WARNING THAT THE ENGINE IS RUNNING WHEN YOU OPEN THE DOOR. THE DOOR CAN BE

---

[97] *Id.* at 2 (emphasis added).
[98] *Id.* at 8.

LOCKED AND YOU WALK AWAY WITH THE VERY QUIET ENGINE RUNNING. HAD THIS HAPPENED WITH THE VEHICLE PARKED IN MY GARAGE THE HOUSE WOULD FILL WITH CARBON MONOXIDE AND SOMEONE COULD DIE.[99]

(x)     On June 9, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10724386, stating:

I NEGLECTED TO PUSH THE START/STOP BUTTON UPON EXITING THE CAR. CONSEQUENTLY, THE CAR CONTINUED TO RUN. AT 10:30 PM, NEEDING A TOOL, I WENT BACK AND OPENED THE GARAGE DOOR. A RUSH OF HOT AIR HIT ME IN THE FACE. TO MY HORROR, I REALIZED THAT I DID NOT SHUT THE CAR OFF. GARAGE TEMPERATURE HAD TO BE ABOUT 120 DEGREES. WHO KNOWS WHAT COULD HAVE HAPPENED, HAD THE CAR RUN ALL NIGHT. **I THINK THERE'S A SIMPLE EASY INEXPENSIVE FIX TO THIS. SOLUTION: REQUIRE ALL AUTO MANUFACTURERS, UTILIZING THE KEYLESS IGNITION OPTION, TO, MANDATORILY, EQUIP ALL VEHICLES WITH AN AUTOMATIC SHUT OFF IF A CAR IDLES IN PARK (TRANSMISSION SELECTION) FOR MORE THAN 20 MINUTES.** THIS SAFETY OPTION SHOULD NOT BE ABLE TO BE OVER RIDDEN BY CUSTOMER. I'M JUST THANKFUL THAT MY GARAGE WAS DETACHED. CARBON MONOXIDE DEATHS VIA KEYLESS IGNITION ARE EASILY AVOIDABLE.[100]

(y)     On June 29, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10744763, stating:

I LIVE IN A ONE FAMILY HOUSE WITH AN ATTACHED GARAGE. MY WIFE PARKED THE CAR, WITH 1/3 OF A TANK OF GAS, IN OUR GARAGE ABOUT 6:30 PM ON AUGUST 17. SHE THOUGHT SHE HAD PUSHED THE BUTTON TO TURN OFF THE ENGINE, AND EXITED THE CAR TAKING THE SMART KEY WITH HER. ABOUT 9 THE NEXT MORNING, WHILE WALKING MY DOG, I FELT HEAT COMING FROM THE GARAGE AND OPENED THE DOOR. IT WAS VERY HOT TO

---

[99] *Id.* at 7.
[100] *Id.* at 6 (emphasis added).

TOUCH. I THEN TOUCHED THE CAR AND BURNED MY HAND. I CALLED OUR LOCAL FIRE DEPARTMENT AND THEY PULLED THE CAR OUT OF THE GARAGE. THE CAR WAS SO HOT, A CD IN THE DOOR COMPARTMENT MELTED. THE FIREMEN EXPLAINED THAT MY WIFE AND I AND OUR DOG, COULD VERY EASILY HAVE BEEN KILLED BY CARBON MONOXIDE AND THE ENTIRE STRUCTURE COULD HAVE BURNED FROM THE HEAT. I HAVE SINCE LEARNED THAT **WHAT HAPPENED TO ME IS A COMMON OCCURRENCE AND PEOPLE HAVE DIED AS A RESULT. EVEN IF THE SMART KEY IS NOT NEAR THE CAR, IT WILL CONTINUE TO RUN UNTIL IT IS OUT OF GAS**.[101]

(z)     On August 28, 2015, a person with a Toyota Group vehicle filed NHTSA complaint number 107605523, stating:

I PARKED THE CAR IN MY INDOOR GARAGE (PART OF THE INTERIOR OF MY HOME). SEVERAL HOURS LATER, I BEGAN TO FEEL ILL AND COLLAPSED ON THE FLOOR. I WAS ABLE TO CALL 911 AND AN EMERGENCY CREW RESPONDED TO MY HOME. I WAS UNABLE TO OPEN THE DOOR, BUT THEY WERE ABLE TO GAIN ACCESS. THEY IMMEDIATELY DETERMINED THAT MY HOME WAS FILLED WITH CARBON MONOXIDE AND FOUND THAT THE SOURCE WAS THE CAR IN THE GARAGE. THEY DETERMINED THAT THE CAR'S ENGINE HAD BEEN LEFT ON AND THE BATTERY WAS DEAD. THIS WAS THE RESULT OF ME **WALKING AWAY FROM THE CAR, WHICH HAS A "SMART-KEY" IGNITION, WITH THE ENGINE STILL RUNNING. I DID NOT HEAR ANY ALERT FROM THE CAR WARNING ME THAT THE ENGINE WAS RUNNING.** THE MEDICS SAID THAT 5 MORE MINUTES IN MY HOME WOULD HAVE BEEN FATAL, AND I WAS RUSHED BY AMBULANCE TO A HOSPITAL, WHERE I REMAINED FOR 3 DAYS.[102]

(aa)    On August 31, 2015, a person with a Toyota Group vehicle filed NHTSA complaint number 10760561, stating:

---

[101] *Id.* at 31 (emphasis added).
[102] *Id.* at 30 (emphasis added).

OVER THE LAST COUPLE OF YEARS, AT LEAST 7 TIMES, I HAVE HAD MY CAR STAY RUNNING WHILE I AM AT A RESTAURANT OR WHEN I RETURN HOME. I PARK OUTSIDE AND AT LEAST 3 TIMES OVER THE LAST 6 YEARS NEIGHBORS HAVE CALLED AND SAID DID YOU KNOW THAT YOUR CAR ENGINE WAS RUNNING. ABOUT THREE WEEKS AGO, IN EARLY AUGUST, I WAS AT A RESTAURANT IN CLINTON, NEW YORK WHERE THE CAR WAS RUNNING ON THE STREET SEVERAL BLOCKS AWAY FOR THE WHOLE TIME WE WERE IN THE RESTAURANT. EACH TIME I THOUGHT I'D PUT MY FOOT ON THE BRAKE AND PUSHED IN THE BUTTON TO SHUT OFF THE CAR. I AM SO GLAD THAT YOU ARE INVESTIGATING THIS. IF **I HAD AN INTERIOR GARAGE WHERE I PARKED AT MY HOME, I COULD HAVE KILLED PEOPLE WITH THE BUILD UP OF THE CARBON MONOXIDE. I CAN'T SEE WHY TOYOTA CAN'T HAVE A BLINKING LIGHT WHEN THE CAR IS ON OR HAVE THE CAR AUTOMATICALLY CUT OFF AFTER A FEW MINUTES.** ONE OTHER THING, IS THAT MY CAR, WHICH I LOVE, RUNS SO QUIETLY, THAT **IT IS ALMOST IMPOSSIBLE TO HEAR THE ENGINE WHEN IT IS IDLING**. THANK YOU SO MUCH FOR INVESTIGATING THIS SERIOUS ISSUE.[103]

(bb)   On September 1, 2015, a person with a Hyundai/Kia Group vehicle filed NHTSA complaint number 10760623, which reported one injury, stating:

THE CONTACT OWNS A 2014 HYUNDAI SONATA. THE CONTACT STATED THAT THE KEYLESS START FUNCTIONALITY DID NOT PERFORM AS INTENDED, WHICH RESULTED IN CARBON MONOXIDE SPREADING THROUGHOUT THE RESIDENCE. **WHEN THE VEHICLE WAS PURCHASED, THE DEALER INFORMED THE CONTACT THAT THE KEYLESS START SYSTEM IN THE VEHICLE HAD AN IDLE TIMER THAT WAS SUPPOSED TO SHUT THE VEHICLE OFF WHEN IDLING FOR A PERIOD OF TIME**. THE CONTACT REQUIRED MEDICAL ATTENTION AND THE PHYSICIAN DIAGNOSED THAT THE CONTACT HAD CARBON MONOXIDE

---

[103] *Id.* at 29 (emphasis added).

POISONING. THE VEHICLE WAS NOT DIAGNOSED. THE MANUFACTURER WAS NOT MADE AWARE OF THE ISSUE. THE APPROXIMATE FAILURE MILEAGE WAS 10,000[104]

(cc)    On September 5, 2015, a person with a Hyundai/Kia Group vehicle filed NHTSA complaint number 10762451, stating:

THIS HYUNDAI SONOTA [SIC] HAS A PUSH BUTTON IGNITION. ONCE THE ENGINE IS STARTED, A PERSON CAN LEAVE THE VEHICLE WITH THE KEY FOB IN THEIR POCKET AND THE ENGINE STAYS RUNNING AND WILL NOT SHUT OFF. … ONCE THE KEY IS REMOVED FROM THE VEHICLE THE ENGINE SHOULD SHUT OFF. THIS ENGINE IS SO QUIET YOU CANNOT EVEN HEAR IT RUNNING WHILE IN THE VEHICLE AND IF SOMEONE IS PARTIALLY COLOR BLIND YOU CAN BARELY SEE THE RED AND GREEN INDICATOR. THIS ENGINE WILL RUN IN AN IDLE STATE NO MATTER WHERE THE KEY CAUSING RISK OF FIRE, CARBON MONOXIDE POISINING [SIC] AND DEATH AND INJURY TO ANYONE NEAR THIS VEHICLE IF LEFT RUNNING AND SINCE THE CAR STAYS RUNNING ONCE IT IS STARTED ANYONE CAN WALK AWAY WITH THE KEY FOB IN THEIR POCKET AND THE CAR STAYS RUNNING NO MATTER WHAT. THERE ARE NO REMINDERS WHEN EXITING THE VEHICLE THAT THE ENGINE IS RUNNING, THERE IS NO AUTOMATIC SHUT OFF IN THE VEHICLE, THERE ARE NO REMINDERS IN THE VEHICLE THAT THE ENGINE IS RUNNING. THE PUSH BUTTON STARTS ARE NOT ONLY A SAFETY THREAT BUT ALSO CAN BE HAZARD IN A PARKING GARAGE IF THE ENGINE CATCHES FIRE DUE TO OVER HEATING IT CAN AFFECT ALL THE OTHER VEHICLES IN A PARKING GARAGE AND CAUSE EVEN WORSE DAMAGE[105]

(dd)    On October 9, 2015, a person with an FCA Group vehicle filed NHTSA complaint number 10780974, stating:

THE 2015 JEEP GRAND CHEROKEE LIMITED COMES WITH PUSH BUTTON STARTING. WITH THE CAR LEFT RUNNING AND THE FOB KEY

---

[104] *Id.* at 28 (emphasis added).
[105] *Id.* at 27 (emphasis added).

TAKEN AWAY FROM THE VEHICLE, **THE CAR CONTINUES TO RUN FOR HOURS**. IF IT IS NOT LOCKED, ANYONE CAN SIMPLY GET IN AND DRIVE IT AWAY TO UNLIMITED DISTANCES. IF SOMEONE PARKS THE CAR IN A GARAGE AND FORGETS TO TURN IT OFF, **IT WILL RUN FOR HOURS, FILL THE GARAGE/HOUSE WITH CARBON MONOXIDE** AND HAS ALREADY BEEN IDENTIFIED AS THE CAUSE OF 13 DEATHS IN THE US. THE PUSH BUTTON STARTING WAS A BAD IDEA. THE SIMPLE KEY, USED FOR DECADES, ALLOWED THE CAR TO BE STARTED, AND **WHEN THE KEY WAS SHUT OFF AND REMOVED, THE CAR WAS SHUT DOWN. SIMPLE!** IN MY OPINION THE PUSH BUTTON STARTING WAS A BAD IDEA AND NEEDS TO BE REVISED. IF THE FOB KEY LEAVES THE CAR, AND THE CAR IS STILL RUNNING, THE CAR ALARM SHOULD GO OFF, WARNING THE DRIVER THAT THE CAR NEEDS TO BE SHUT DOWN FIRST.[106]

(ee)    On October 19, 2015, a person with a GM Group vehicle filed NHTSA complaint number 10783539, stating:

TWICE I HAVE WALKED BACK TO MY CAR & FOUND THAT THE ENGINE HAS REMAINED ON. AFTER PARKING, I PRESS THE ENGINE ON/OFF BUTTON, EXIT THE CAR, LOCK ALL DOORS WITH THE FOB AND WALK AWAY. THIS TIME, **I PARKED IN A VERY LARGE, CROWDED PUBLIC PARKING LOT. I WAS AT LEAST 6 BLOCKS AWAY FROM THE CAR FOR 2 HOURS.** THANKFULLY, THIS HAS OCCURRED WHEN THE CAR IS OUTSIDE, NOT IN MY GARAGE. IN RECENT LIGHT OF PEOPLE SUCCUMBING TO CARBON MONOXIDE POISONING DUE TO THIS VERY SITUATION OCCURRING WITH CARS IN CLOSED GARAGES, I WOULD EXPECT A VOLUNTARY OR FORCED RECALL TO REMEDY THIS GM ADMITTED DESIGN DECISION.[107]

(ff)    On October 28, 2015, a person with a Ford vehicle filed NHTSA complaint number 10806904 with a report of two deaths, stating:

---

[106] *Id.* at 34 (emphasis added).
[107] *Id.* at 33 (emphasis added).

CONSUMER STATED HER **BROTHER WALKED INTO HORRIBLE SCENE AND FOUND BOTH OF THEIR PARENTS DEAD**. THE CAUSE WAS CARBON MONOXIDE POISONING FROM A 2013 LINCOLN MKS VEHICLE THAT WAS INADVERTENTLY LEFT RUNNING IN THEIR GARAGE. **THE VEHICLE HAD A KEYLESS IGNITION SYSTEM THAT FAILED TO HAVE AN AUTOMATIC SHUTOFF** OR AN ADEQUATE AUDIBLE ALARM.[108]

201.   These consumer complaints and reports to NHTSA are consistent. Each one outlines the safety issues associated with the Defect, and the complaints put Toyota Group on actual notice of the exact, simple, and basic remedy sought here: Auto-Off.

**I.    Toyota Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Various Non-Binding NHTSA Suggestions**

202.   Upon information and belief, Toyota Group regularly reviews NHTSA proposed rules, various stakeholders' responses to those proposed rules, NHTSA-related entries on the Federal Register, and NHTSA's interpretation letters sent in response to manufacture guidance requests.

203.   On August 15, 2002, in a public interpretation letter (directed to Nissan Group, specifically), NHTSA warned of the human-factors implications of Keyless Fob systems. Specifically, NHTSA stated that Keyless Fobs pose additional risks over Physical Keys because "the driver must physically touch a traditional key, unlike the 'Smart Key' device, as part of turning off the engine."

204.   On July 17, 2003, in a public interpretation letter, NHTSA again warned of the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key. NHTSA warned that disruption of the traditional relationship would have unintended consequences.

---

[108] *Id.* at 32 (emphasis added).

Specifically, NHTSA stated that Keyless Fobs pose additional risks because "there appears to be a greater likelihood of drivers inadvertently leaving transceiver-type devices in the car, as compared to a traditional key. This is because the driver must physically touch a traditional key, unlike the transceiver-type device, as part of turning off the engine."

205.   On December 12, 2011, NHTSA published a Notice of Proposed Rulemaking, which has never been acted on or implemented, outlining the dangers of Keyless Fobs.[109] Specifically, NHTSA stated that "driver[s] may not immediately know that the propulsion system has not been turned off."[110] The NHTSA proposed rule outlined two incidents in which vehicle owners whose Keyless Fob cars were left with the engine running were lucky enough to have been alerted by in-home carbon monoxide detectors before death, but "[o]thers, not as fortunate, may have died because of carbon monoxide poisoning from their vehicles."[111] NHTSA explained the dangers succinctly: "If [a] vehicle [equipped with a Keyless Fob] is in an enclosed garage connected to living quarters, this situation [in which the engine remains running] may result in carbon monoxide poisoning of persons in the dwelling; if outdoors, this increases the possibility of vehicle theft and a subsequent crash."[112] And because Keyless Fobs are a technology new to most consumers "in many ignition systems that don't use physical keys, the driver may not know whether s/he has turned off the vehicle propulsion system."[113] Simply put, NHTSA stated that "with keyless ignition systems, it is not obvious to the driver that s/he has left the 'key' … behind and

---

[109] Federal Motor Vehicle Safety Standards; Theft Protection and Rollaway Prevention, 76 Fed. Reg. 77,183, 77,200 (Dec. 12, 2011) (to be codified at 49 C.F.R. Part 571) (no final NHTSA rulemaking, codification, or denial has taken place as a result of this proposed rule).

[110] *Id.* at 77187.

[111] *Id.* at 77188.

[112] *Id.*

[113] *Id.*

also it may not be obvious that the engine or other propulsion system is running."[114]

206.   While none of these NHTSA-related documents have resulted in any regulatory action or rule, they have made Toyota Group aware of the dangerous carbon monoxide poisoning consequences of vehicles without Auto-Off and the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key. Thus, these NHTSA-related documents show that no later than August 15, 2002, Toyota Group was aware of the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key, exacerbating these risks.

**J.    Toyota Group has (and had) Actual Knowledge that the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs Can Be Fully Mitigated through the Implementation of Auto-Off**

207.   "Auto-Off" is feasible for Toyota Group to implement—immediately.

208.   Auto-Off is not only feasible; it has *already* been implemented by several auto manufacturers to prevent the very Defect described herein.

209.   For example, and as noted above,[115] the GM Group has not only instituted an Auto-Off in its 2014-2015 model year Chevrolet Volts, due to safety concerns, it *recalled* all of its prior model year (2011-2013) Chevrolet Volts due to the lack of such a system because "carbon monoxide could build up in [an] enclosed space."[116]

210.   Given the prevalence of the Defect, Toyota Group's failure to immediately implement Auto-Off is a material and unreasonable safety risk. As a result, Toyota Group's nondisclosure of the Defect in Plaintiffs' and Class

---

[114] *Id.* at 77191.
[115] *See* ¶¶ 183-185, *supra*.
[116] NHTSA Safety Recall 14617: *Defect Notice report*, www.nhtsa.dot.gov., http://www.odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

1    Members' sales brochures or any other pre-sale materials was (and remains)

2    unreasonable.

3         211.   Upon information and belief, Toyota Group regularly reviews (and

4    attempts to emulate and implement) the technological innovations instituted by

5    competitor Automakers, including those pertaining to automotive safety. Thus, the

6    Auto-Off and related automatic shutdown systems described herein are within the

7    actual knowledge of Toyota Group.

8              **a.    The Ford Group has Implemented Auto-Off for *Some* of its
               Vehicles but has Failed to Implement Auto-Off in *All* of its
9              Vehicles**

10        212.   The 2014 and 2015 Lincoln MKS vehicles, manufactured and

11   designed by the Ford Group, are equipped with a Keyless Fob but are *not* Affected

12   Vehicles because for those vehicles Ford has instituted an Auto-Off system that: 1)

13   shuts down the vehicle after 30-minutes of running if there is no user intervention,

14   and 2) there is no "defeat" mechanism to override this important Auto-Off safety

15   function.

16        213.   The Ford Group stated that the *reason* for implementing the life-

17   saving Auto-Off technology was "in order to save battery power."

18        214.   Other 2013, 2014, and 2015 model year Ford Group vehicles have

19   similarly instituted Auto-Off and are therefore not listed as Affected Vehicles.[117]

20   Yet, despite the fact that the Ford Group has instituted Auto-Off in *some* of its

21   most recent cars, it has failed to install or implement Auto-Off in any of its *older*

22   model year vehicles, nor has it included Auto-Off in many of its newer vehicles,

23

24

25   _____

26   [117] The Ford Group has also installed Auto-Off in the following vehicles: the
     2015 Ford Focus, the 2013-2015 Ford Edge, the 2014-2015 Ford Escape, the 2014-
     2015 Ford Flex, the 2013-2015 Ford Fusion, the 2013-2015 Ford Fusion Hybrid,
27   the 2014-2015 Ford Fusion Energi, the 2015 Ford Mustang, the 2014-2015 Lincoln
     MKT, the 2013-2015 Lincoln MKZ, the 2013-2015 Lincoln MKZ Hybrid, the
28   2015 Lincoln MKC, and the 2015 Lincoln Navigator.

including the Affected Vehicles.[118] For example, Ford/Lincoln did not retroactively cure the Defect in the 2009-2013 Lincoln MKS even though it instituted Auto-Off in the later 2014-2015 Lincoln MKS Vehicles.

**b.**   **The Honda Group has Implemented a *Battery-Saving* Accessory Mode Shut-Down since 2013 but not an *Engine* Auto-Off**

215.   In Honda Group vehicles, accessory mode allows consumers to operate the vehicle's radio, the cigarette lighter power port, and other USB power ports while the engine is turned off. Consumers with a Keyless Fob can turn the engine off while leaving the accessory mode on.

216.   Starting in 2013, the majority of Honda Group vehicles have instituted an automatic shut-down system if the consumer inadvertently leaves the vehicle's accessory mode on.[119] The shut-down system was designed as a convenience feature to prevent against "battery drain," since if left running, the accessory mode could eventually fully drain the vehicle's battery. As part of the shut-down system, the vehicle will automatically turn off the accessory mode after 30 to 60 minutes of vehicle inactivity.

217.   Honda Group's willingness to implement this shut-down system to prevent against battery drain (a minor inconvenience rather than a deadly safety risk) is particularly egregious in light of its failure to implement Auto-Off to ensure that Affected Vehicles' engines do not continuously emit deadly carbon monoxide.

218.   As described herein, if Auto-Off was implemented to stop the vehicle's engine, it would save lives and prevent serious injuries and

---

[118] *See, e.g.,* **Exhibit 1** (vehicles with Keyless Fobs that do have Auto-Off are not listed in this exhibit).

[119] The Honda Group has employed the identical battery drain "Automatic Power Off" technology in at least nine of its models, beginning in 2013: the Honda Accord Sedan, the Honda Accord Coupe, the Honda CrossTour, the Honda Civic Sedan, the Honda Civic Coupe, the Honda Odyssey, the Honda CR-V, the Acura MDX, and the Acura RLX. All of the aforementioned makes and models are Affected Vehicles.

1    hospitalizations – a far more important fix than preventing the inconvenience of a

2    dead car battery.

3             **c.     The Vast Majority of the Automakers have Recognized the
                       Danger of Carbon Monoxide by Implementing an
4                      Automatic Shut Down System for *Remote-Start* Vehicles but
                       not for *Keyless Fob* Vehicles**

5

6    219.   Most of the Automaker Groups, save for BMW Group and MB

7    Group, have instituted a vehicle ignition technology commonly referred to as

8    "Remote Start." The Remote Start system allows consumers the flexibility and

9    convenience of starting their vehicles' engines without actually being inside the

10   vehicles. In other words, the Remote Start system allows the driver to *pre*-start the

11   engine remotely.

12   220.   While the Keyless Fobs described in this Complaint allow a consumer

13   to enter the vehicle and to turn on the engine without removing the Keyless Fob

14   from his/her pocket, the Remote Start takes the technology one step further by

15   allowing consumers the convenience of turning the engine on before opening the

16   vehicle's door.

17   221.   The Remote Start system is a particularly attractive feature to many

18   consumers because it allows a vehicle to be started from the comfort of their home

19   or office. As a result, as soon as the consumer activates the Remote Start system,

20   the vehicle's air conditioning/heating system can cool or warm the vehicle before

21   the consumer even opens the door.

22   222.   Strikingly, many of the Automakers have implemented systems that

23   are the functional equivalent of Auto-Off, except the automatic-shutdown

24   functionality is only used if the engine is *pre*-started using the Remote Start

25   function. Upon information and belief, each of the below-listed Automaker Groups

26   has universally implemented a feature to automatically shut down the vehicles'

27   engines when *Remote Start* is used, **but not** when Keyless Fobs are used to start

28

the vehicles from the inside. Each of the below-listed vehicles is the first model by each Automaker Group to integrate Remote Start:

    (a)    <u>Ford Group:</u> 2009 Lincoln MKS

    (b)    <u>Toyota Group</u>: 2007 Toyota Camry

    (c)    <u>Nissan Group</u>: 2013 Infiniti JX

    (d)    <u>Honda Group</u>: 2010 Acura ZDX

    (e)    <u>FCA Group:</u> 2011 Jeep Grand Cherokee

    (f)    <u>Hyundai/Kia Group</u>: 2012 Hyundai Sonata

    (g)    <u>General Motors:</u> 2005 Cadillac STS

    (h)    <u>VW Group:</u> 2013 Volkswagen Passat

223.   The same technology that the above Automakers have implemented to limit carbon monoxide emissions, and thereby prevent carbon monoxide deaths and injuries in a Remote Start vehicle has **not** been implemented on ordinary Keyless Fob vehicles.

224.   Each of the above-listed Automaker Groups therefore recognized, acknowledged, and implemented a fail-safe shut-down solution for addressing the risks of carbon monoxide when creating its respective Remote Start features but not for the very same vehicle's Keyless Fob technology.

225.   Each of the above-listed Automaker Groups therefore had knowledge of the dangers of carbon monoxide poisoning for unattended vehicles with their engines left running at least as early as the dates of the designs of each of the makes and models listed in Paragraph 222.

## VI.   EXCLUSIVE KNOWLEDGE, CONCEALMENT, AND SAFETY DEFECT ALLEGATIONS

226.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals associated with Toyota Group responsible for disseminating false and misleading marketing materials (i.e., the marketing materials with material

omissions) regarding its Affected Vehicles. Toyota Group is necessarily in possession of all of this information.

227.   Plaintiffs' claims arise out of Toyota Group's exclusive knowledge of and/or concealed material information regarding the Defect and the safety hazard it poses. There is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, specifically at the time they purchased or leased their Affected Vehicles, Toyota Group knew the safety dangers of not including Auto-Off. Toyota Group was under a duty to disclose the Defect based upon its exclusive knowledge of and/or concealed material information regarding the Defect; Toyota Group failed to disclose the Defect to Plaintiffs or the public at any time or place or in any manner such that it could (and would) have affected Plaintiffs and the Classes' pre-sale decision to purchase and/or lease its Affected Vehicles.

228.   Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Toyota Group:

(a)   *Who*: Toyota Group had and has exclusive knowledge of the Defect and failed to disclose to Plaintiffs and/or concealed material information regarding the Defect from Plaintiffs. Toyota Group similarly failed to disclose the Defect's dangerous safety risks in its Affected Vehicles. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals responsible for such decisions.

(b)   *What*:

(i)   Toyota Group failed to disclose that its Affected Vehicles contain the Defect. Toyota Group has and had exclusive knowledge of and/or concealed material information that its Affected Vehicles contain the Defect. Yet

Toyota Group failed to disclose the same in the sales brochures or any other pre-sale materials.[120]

(ii)     Toyota Group could have, but failed to, disclose to consumers the risks of vehicles with Keyless Fobs that lack Auto-Off. An exemplar of a simple but effective disclosure that was omitted from any and all of its Affected Vehicles' pre-sale materials is:

> **WARNING**: This vehicle is equipped with a keyless ignition. Once the engine is started, the engine will continue to run even if the vehicle is parked and even if the keyless ignition fob is removed from the vehicle. This vehicle's engine will never automatically turn off absent affirmative user interaction. If your keyless-fob equipped vehicle remains running, you and those who are nearby your vehicle are at an increased risk of carbon monoxide poisoning, **which may result in injury or death**, especially if the vehicle remains running in an enclosed environment such as a garage. Carbon monoxide is an odorless and colorless gas that cannot be detected by any of the human senses.

(c)     **When**: Toyota Group had exclusive knowledge of and/or concealed material information regarding the Defect starting no later than the date of introduction of certain models of Affected Vehicles to the market, continuing through the time of sale for each of its Affected Vehicles.[121]

(d)     **Where**: Toyota Group concealed material information regarding the true nature of the Defect in every pre-sale communication they had with Plaintiffs and the Class. Despite counsel's review and analysis of marketing materials, sales brochures, and other pre-sale enticements to purchase each of its Affected Vehicles, Plaintiffs are aware of no document, communication, or other

---

[120] *See* **Exhibits 4 – 10** (automotive pre-sale sales brochures reviewed by each of the respective Plaintiffs).

[121] Further, since 2002, Each of the Automakers had exclusive knowledge of and/or concealed material information regarding the Defect because that is the date when NHTSA issued an interpretation letter regarding the human-factors analysis as to disconnect between drivers' understanding of Keyless Fobs when compared to Physical Keys. *See* ¶ 203, *supra*.

place or thing, in which Toyota Group disclosed the truth about the Defect in its Affected Vehicles to consumers. Such information is not disclosed in any pre-sale documents, displays, advertisements, on Toyota Group's websites, or on any other pre-sale communication.

(e) ***How***:

(i) Toyota Group had exclusive knowledge of and/or concealed material information about the Defect and failed to disclose the Defect to Plaintiffs and Class Members in any pre-sale materials—the time at which Plaintiffs and the Class could have acted. Toyota Group had exclusive knowledge of and/or actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class Members at all times, even though Toyota Group knew about the Defect and knew that information about the Defect would be important to a reasonable consumer.

(ii) Toyota Group has failed to disclose the truth about the Defect in its Affected Vehicles to consumers. Thus, Toyota Group has never taken any action to inform consumers about the true nature of the Defect in its Affected Vehicles despite the fact that Toyota Group had exclusive knowledge of and/or actively concealed the truth about the existence and nature of the Defect.

(iii) Exclusive knowledge of and/or concealed material information about the Defect applicable to Toyota Group, in chronological order:

a. **August 15, 2002** – NHTSA issued an interpretation letter warning manufacturers of the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key;[122]

b. **November 16, 2007** – Magna Electronics Inc. applied for the first third-party patent concerning a proposed Auto-Off system to

---

[122] *See ¶* 203, *supra.*

prevent the dangerous carbon monoxide risks caused by an unattended vehicle left running in an enclosed environment;[123]

     c.    **April 6, 2009** – The first of thirty-five consumer complaints was submitted to NHTSA about the carbon monoxide poisoning risks posed by Keyless Fobs without Auto-Off;[124] and

     d.    **November 1, 2011** – Ford filed for a patent, application number 2013/0110374, to address the Defect by proposing an Auto-Off system.[125]

     e.    Further, although Toyota Group, upon information and belief, knew of all of the following facts pertaining to other Automaker Groups, Plaintiffs list Toyota Group's knowledge as to their own actions (and inactions) here:

     (1)    **Late 2006** – Toyota Group instituted a Remote Start automatic shutdown system in its 2007 Toyota Camry in order to limit carbon monoxide emissions in pre-start situations;[126]

     (2)    **April 6, 2009 –** The first of at least sixteen consumer complaints directed to Toyota Group was submitted to NHTSA regarding carbon monoxide poisoning and Keyless Fobs; this complaint evidences that Lexus has falsely stated that it cannot do anything to implement Auto-Off;[127]

     (3)    **February 9, 2010** – NHTSA complaint regarding a 2009 Toyota Camry Hybrid warning of a "SAFETY HAZARD!" regarding the defect;[128]

---

[123] *See* ¶ 191(a), *supra.*
[124] *See* ¶ 200(a), *supra.*
[125] *See* ¶ 189, *supra.*
[126] *See* ¶ 222(b), *supra.*
[127] *See* ¶ 200(a), *supra.*
[128] *See* ¶ 200(d), *supra.*

            (4)    **April 28, 2010** – A consumer submitted a complaint to NHTSA regarding a Toyota vehicle, alleging that a Lexus representative stated that he/she sees no problems with the Keyless Fob systems;[129]

            (5)    **May 28, 2010** – NHTSA complaint regarding a 2009 Toyota Highlander Hybrid regarding the Defect and warning that the silent nature of the car adds to the hazard;[130]

            (6)    **October 29, 2010** – Personal injury lawsuit was filed by Mary Rivera due to the Defect in a 2008 Lexus EX 350, resulting in a confidential settlement;[131]

            (7)    **November 1, 2010** – Wrongful death lawsuit for the death of Ernest Codelia, Jr. due to the Defect in a 2008 Lexus EX 350, resulting in a confidential settlement;[132]

            (8)    **January 5, 2011** – NHTSA complaint reporting a death as a result of the Defect; [133]

            (9)    **March 20, 2011** – NHTSA complaint regarding a 2011 Toyota Camry XLE and reporting two injures as a result of the Defect, and specifically requesting Auto-Off be implemented;[134]

            (10)    **April 1, 2011** – Wrongful death lawsuit on behalf of Meyer Michael Yaffe, who died on December 30, 2010, as a result of the Defect in his 2009 Lexus EX 350;[135]

---

[129] *See* ¶ 200(e), *supra.*
[130] *See* ¶ 200(f), *supra.*
[131] *See* ¶ 194, *supra.*
[132] *See* ¶ 193, *supra.*
[133] *See* ¶ 200(g), *supra.*
[134] *See* ¶ 200(i), *supra.*
[135] *See* ¶ 195, *supra.*

(11)   **June 14, 2011** – Wrongful death lawsuit on behalf of Chastity Glisson, who died on December 30, 2010, as a result of the Defect in her 2006 Lexus IS 250;[136]

(12)   **November 29, 2011** – NHTSA complaint regarding a 2010 Lexus RX 450h regarding the Defect and warning that the silent nature of the car adds to the hazard; [137]

(13)   **May 10, 2012** – NHTSA complaint regarding a 2011 Lexus ES350 and reporting one injury as a result of the Defect;[138]

(14)   **June 6, 2013** – News story death of a couple as a result of the Defect in a Toyota Avalon, such resulted in a wrongful death lawsuit filed on December 30, 2014;[139]

(15)   **July 19, 2013** – NHTSA complaint regarding a 2012 Toyota Camry reporting that the dealership laughed at the customer's safety concern about the Defect;[140]

(16)   **April 22, 2014** – News story regarding hospitalization of a couple as a result of the Defect in a Lexus ES350;[141]

(17)   **December 2, 2014** – NHTSA complaint regarding a 2009 Toyota Camry and reporting two injures as a result of the Defect;[142]

(18)   **August 28, 2015** – NHTSA complaint regarding a Toyota Group vehicle and the Defect and warning that the silent nature of the car adds to the hazard;[143]

---

[136] *See* ¶ 196, *supra*.
[137] *See* ¶ 200(k), *supra*.
[138] *See* ¶ 200(m), *supra*.
[139] *See* ¶ 180(b), *supra*.
[140] *See* ¶ 200(p), *supra*.
[141] *See* ¶ 180(c), *supra*.
[142] *See* ¶ 200(t), *supra*.

(19)   **August 31, 2015** – NHTSA complaint regarding a Toyota Group vehicle and the Defect and warning that the silent nature of the car adds to the hazard; this person experienced the Defect in his or her garage, which could have been fatal;[144] and

(20)   **November 7, 2015** – News story of hospitalization of nine persons, including two minors and three first responders as a result of the Defect in a Toyota Sienna.[145]

(f)     *Why*: Toyota Group concealed and/or had exclusive knowledge of material information about the Defect in its Affected Vehicles yet failed to disclose the Defect in order to induce Plaintiffs and Class Members to purchase or lease its Affected Vehicles rather than competitors' vehicles. Had Toyota Group disclosed the truth, Plaintiffs (and reasonable consumers) either 1) would have paid less for the Affected Vehicles by not purchasing optional equipment packages with the Keyless Fob technology, or 2) would not have purchased or leased the Affected Vehicles where the Keyless Fob was standard equipment, instead purchasing a vehicle with a Physical Key or a vehicle with Auto-Off, or otherwise would have paid less for the Affected Vehicles.

(g)     *Safety Defect:*

(i)     Toyota Group, like all Automakers, is under a duty to disclose a known defect in a vehicle when there are safety concerns associated with the vehicle's use – i.e., where the failure to disclose implicates a safety issue. Manufacturers may be held liable for their failure to disclose a defect when such an omission pertains to a safety issue. In this case, as stated above, Toyota Group knew about the Defect, and the Defect poses a physical threat to Plaintiffs' own

---

*(continued)*
    [143] *See* ¶ 200(z), *supra*.
    [144] *See* ¶ 200(aa), *supra*.
    [145] *See* ¶ 200(g), *supra*.

1  safety or the safety of others. Nevertheless, Toyota Group failed to disclose the

2  Defect to all owners of Affected Vehicles.

3              (ii)    Moreover, Toyota Group took partial steps to ensure that

4  their Keyless Fob vehicles would go off automatically in order to limit excessive

5  carbon monoxide emissions after starting the vehicles remotely. Toyota Group did

6  not, however, take similar steps after starting the vehicles when using the Keyless

7  Fob "Start/Stop" button.

8              **VII.   TOLLING OF THE STATUTE OF LIMITATIONS**

9  **A.    Fraudulent Concealment Tolling**

10  229.   Upon information and belief, Toyota Group has known of the Defect

11  in its Affected Vehicles since at least 2002,[146] if not earlier, and Toyota Group has

12  had such exclusive knowledge and concealed such facts from Plaintiffs, Class

13  Members, and the public of the full and complete nature of the Defect.

14  230.   Any applicable statute of limitation has therefore been tolled by

15  Toyota Group's exclusive knowledge, active concealment, and denial of the facts

16  alleged herein, which behavior is ongoing.

17  **B.    Estoppel**

18  231.   Toyota Group was and is under a continuous duty to disclose to

19  Plaintiffs and Class Members the true character, quality, and nature of its Affected

20  Vehicles. Toyota Group had exclusive knowledge of and/or actively concealed the

21  true character, quality, and nature of its Affected Vehicles despite its exclusive

22  knowledge that its Affected Vehicles were and are unsafe. Toyota Group had

23  exclusive knowledge of and/or concealed these facts. Based on the foregoing,

24  Toyota Group is estopped from relying on any statutes of limitation in defense of

25  this action.

26

27

28  ───────────

[146] This is the date of the first NHTSA attention to this matter. *See* ¶ 203, *supra*.

## C.    Discovery Rule

232.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Affected Vehicles had the Defect. As discussed herein, many Plaintiffs only became aware of the Defect after multiple instances during which the Affected Vehicles were inadvertently left running.

233.   However, Plaintiffs and Class Members had no realistic ability to discern that the Affected Vehicles were defective until—at the earliest—after the first manifestation of the Defect. Even then, Plaintiffs and Class Members had no reason to know the Defect was caused by Toyota Group's active concealment of the same. Not only did Toyota Group fail to notify Plaintiffs or Class Members about the Defect, Toyota Group has continued to deny any knowledge of or responsibility for the Defect. Thus, Plaintiffs and Class Members were not reasonably able to discover the Defect until after they purchased or leased the Affected Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they personally discovered that the Defect can lead to carbon monoxide poisoning.

## VIII.  CLASS ACTION ALLEGATIONS

234.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. If, in any instance, the Court finds (b)(3) requirements are not met, Plaintiffs and Class Members alternatively seek certification under Federal Rules of Civil Procedure 23(a) and 23(c)(4).

235.   The Classes are defined as:

(a)    All persons in the State of California who purchased or leased a Toyota Group Affected Vehicle (the "California Class");

(b)     All persons in the State of Massachusetts who purchased or leased a Toyota Group Affected Vehicle (the "Massachusetts Class"); and

(c)     All persons in the State of New Jersey who purchased or leased a Toyota Group Affected Vehicle (the "New Jersey Class").

(d)     Excluded from all of the Classes are: (1) Toyota Group, any entity or division in which the Toyota Group has a controlling interest, and its legal representatives, officers, directors, assignees, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) individuals who have suffered personal injuries as a result of the facts alleged herein.

236.    In the alternative, pursuant to Federal Rules of Civil Procedure 23(a) and 23(c)(5), Plaintiffs and Class Members reserve the right to propose class groupings of states that do not have materially different bodies of state law.

237.    Plaintiffs reserve the right to amend the Class if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**A.    Numerosity & Ascertainability**

238.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. Upon information and belief, the number of Affected Automobiles as outlined in **Exhibit 1** is in excess of 5,000,000 vehicles. Upon information and belief, the number of Toyota Group's Affected Automobiles as outlined in **Exhibit 1** is in excess of 500,000 vehicles. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

239.    Class Members are readily identifiable from information and records in Toyota Group's possession, custody, or control, including the VIN and/or

specifications sheets, as well as from records maintained by the various states' Departments of Motor Vehicles.

**B.    Typicality**

240.   The claims of the putative representative Plaintiffs are typical of the claims of others in the same state and with the same Toyota Group Affected Vehicles in that the putative representative Plaintiffs, like all Class Members, purchased or leased an Affected Vehicle designed, manufactured, and distributed by Toyota Group. As previously noted, each of the Automaker Groups' Keyless Fobs work in a nearly identical (if not completely identical) manner. The representative Plaintiffs, like all Class Members, have been damaged by Toyota Group's misconduct in that Plaintiffs have, among other reasons, 1) incurred a diminution in the value of his/her Affected Vehicle as a result of the Defect, 2) overpaid for the Affected Vehicles as a result of the Defect, and 3) incurred and continue to incur substantial risk as a result of the Defect and Toyota Group's refusal to remedy the Defect. Furthermore, the factual bases of Toyota Group's misconduct are common to all Class Members, and represent a common thread of misconduct resulting in injury to all Class Members.

**C.    Adequate Representation**

241.   Plaintiffs will fairly and adequately represent and protect the interests of each of their respective Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

242.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the respective Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the proposed Classes.

**D.      Predominance of Common Issues**

243.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answer to which will advance resolution of the litigation as to all Class Members and/or state sub-classes. These common legal and factual issues include:

(a)      whether the Affected Vehicles suffer from the Defect;

(b)      whether the Defect constitutes an unreasonable safety risk;

(c)      whether Toyota Group knew about the Defect, and, if yes, how long Toyota Group has known of the Defect;

(d)      whether the defective nature of Toyota Group's Affected Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase an Affected Vehicle;

(e)      whether Toyota Group has a duty to disclose the defective nature of its Affected Vehicles to Plaintiffs and Class Members;

(f)      whether Toyota Group omitted and failed to disclose material facts about its Affected Vehicles;

(g)      whether Toyota Group's concealment of the true defective nature of its Affected Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing Affected Vehicles;

(h)      whether Toyota Group omitted material facts about its Affected Vehicles' characteristics, uses, or benefits in violation of California's Consumer Legal Remedies Act ("CLRA") § 1770(a)(5);

(i)      whether Toyota Group omitted material facts about its Affected Vehicles' standard, quality, or grade when they were of another, in violation of the CLRA § 1770(a)(7);

(j)      whether Toyota Group omitted material facts about its Affected Vehicles in advertisements, in violation of the CLRA § 1770(a)(9);

1    (k) whether Toyota Group omitted material facts about the true

2 defective nature of its Affected Vehicles, and if so, if those omissions were likely

3 to mislead or deceive, and therefore were fraudulent, within the meaning of Cal.

4 Bus. & Prof. Code §§ 17200, *et seq.*;

5    (l) whether each Toyota Group omitted material facts about the

6 true defective nature of its Affected Vehicles such that the conduct was unfair

7 within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

8    (m) whether Toyota Group failed to disclose and/or actively

9 concealed the Defect in its Affected Vehicles under the Massachusetts Consumer

10 Protection Act, Mass. Gen. Laws Ch. 93A by failing to adequately investigate,

11 disclose, and remedy, their omissions regarding the safety, reliability, and

12 functionality of their Affected Vehicles;

13    (n) whether Toyota Group failed to disclose and/or actively

14 concealed the Defect in its Affected Vehicles under the New Jersey Consumer

15 Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* by failing to state that Affected

16 Vehicles have dangerous characteristics, failing to state that Affected Vehicles are

17 of a particular standard and quality, and otherwise engaging in conduct likely to

18 deceive;

19    (o) whether Plaintiffs and the other Class Members are entitled to a

20 declaratory judgment stating that Toyota Group's Affected Vehicles are defective

21 and/or not merchantable;

22    (p) whether Plaintiffs and the other Class Members are entitled to

23 equitable relief, including, but not limited to, a preliminary and/or permanent

24 injunction;

25    (q) whether Toyota Group have acted or refused to act on grounds

26 generally applicable to the Plaintiffs and State Classes, thereby making appropriate

27 final and injunctive relief with respect to each of the State Classes;

28

(r)     whether Toyota Group should be declared financially responsible for notifying all Class Members who own or lease its Affected Vehicles of the Defect and for the costs and expenses of permanently remedying the Defect in its Affected Vehicles; and

(s)     whether, under each state's law as named herein, if plaintiffs do not have an adequate remedy at law, if they are entitled to equitable relief under an unjust enrichment theory because of the benefit conferred on them by Plaintiffs and other Class Members such that it would be inequitable, unconscionable and unjust for Toyota Group to retain that benefit.

**E.     Superiority**

244.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Toyota Group's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

245.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Member's claims, it is likely that only a few Class Members could afford to seek legal redress for Toyota Group's misconduct. Absent a class action, Class Members will continue to incur damages, and Toyota Group's misconduct will continue without remedy.

246.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

# IX.   CAUSES OF ACTION

**A.    Claims Brought on Behalf of the California Class**

## FIRST CAUSE OF ACTION

**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code § 1750, *et seq.*)**

247.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

248.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Richard Draeger, Stanley and Janet Neill, and Neil Stevens bring this claim against the Toyota Group.

249.   Toyota Group is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

250.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

251.   By failing to disclose the defective nature of its Affected Vehicles to Plaintiffs and Class Members, Toyota Group violated Cal. Civ. Code § 1770(a) because Toyota Group failed to disclose that its Affected Vehicles were of a particular standard, quality, or grade. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

252.   Toyota Group therefore committed unfair and deceptive acts or practices repeatedly in Toyota Group's course of trade or business. Each omission was material, was capable of deceiving a substantial portion of the purchasing public, and imposed a safety risk on the public.

253.   Toyota Group knew that its Affected Vehicles suffered from the Defect and thus were defectively designed or manufactured and were not suitable for their intended use.

254.   Toyota Group was under a duty to Plaintiffs and Class Members to disclose the Defect and rectify it through Auto-Off prior to its Affected Vehicles' sale. Additionally:

(a)   The Defect is a safety hazard;

(b)   Toyota Group was in a superior position to know the true state of facts about the Defect in its Affected Vehicles;

(c)   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Affected Vehicles had the Defect until, at the earliest, the manifestation of the Defect; and

(d)   Toyota Group knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Affected Vehicles' Defect prior to its manifestation.

255.   In failing to disclose the defective nature of its Affected Vehicles, Toyota Group had exclusive knowledge of and/or knowingly and intentionally concealed material facts and breached their duty not to do so.

256.   The facts concealed and/or not disclosed by Toyota Group are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease an Affected Vehicle. Had Plaintiffs and other Class Members known that the Affected Vehicles had the Defect, they would not have purchased or leased an Affected Vehicle.

257.   Plaintiffs and Class Members are reasonable consumers who do not expect their Affected Vehicles will experience the Defect. That is the reasonable and objective consumer expectation relating to the safe and normal operation of a vehicle.

258.   As a result of the conduct of Toyota Group , Plaintiffs and Class Members have been harmed, creating a safety hazard, and causing Class Members to drive with dangerous Affected Vehicles that cannot be remedied without Toyota Group taking action to repair the Defect.

259.   Plaintiffs and the Class are thus entitled to equitable relief.

260.   As a direct and proximate result of the unfair or deceptive acts or practices committed by Toyota Group, Plaintiffs and Class Members also have suffered and will continue to suffer actual damages.

261.   Plaintiffs have provided Toyota Group with proper notice of its alleged violations of the CLRA pursuant to Cal. Civ. Code § 1782(a), via letters sent to Toyota Group and each of its registered agents for service of process on August 25, 2015. Toyota Group has failed to provide the appropriate relief for its violations of the CLRA within 30 days of the date of the notification letter.[147]

262.   Thus, in addition to equitable relief, pursuant to Cal. Civ. Code § 1782(a), Plaintiffs seek actual, statutory, and punitive damages as permitted under the CLRA (Cal Civ. Code §1750, et seq.) and applicable law.

### SECOND CAUSE OF ACTION

### Violation of California's Unfair Competition Law
#### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

263.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

264.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Richard Draeger, Stanley and Janet Neill, and Neil Stevens bring this claim against the Toyota Group.

265.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Toyota Group engaged in conduct that violated each of this statute's three prongs.

---

[147] Certified mail return receipts indicate Toyota Group received the letters by September 2, 2015, or earlier. The Toyota Group responded, but failed to offer any remedy to remedy the Defect as alleged herein. The Toyota Group further failed to address Plaintiffs' concerns about the Automakers' failures to disclose Auto-Off.

266.   Toyota Group committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.,* when it violated the CLRA as alleged in the First Cause of Action, above.

267.   Toyota Group committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when it had exclusive knowledge and/or concealed the existence and nature of the Defect. The Defect presents a safety hazard for occupants of the Affected Vehicles.

268.   Toyota Group committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when it failed to provide a permanent remedy to fix the Defect once and for all in its Affected Vehicles.

269.   Toyota Group committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it had exclusive knowledge and/or concealed the existence and nature of the Defect. The exclusive knowledge and/or active concealment of the Defect by Toyota Group is likely to mislead the public with regard to the true defective nature of its Affected Vehicles.

270.   Toyota Group disseminated advertising that omitted material information in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. and § 17500, *et seq*. when it had exclusive knowledge of and/or concealed the existence and nature of the Defect. This lack of disclosure deceived Plaintiffs and the public at large.

271.   The unfair or deceptive acts or practices of Toyota Group occurred repeatedly in the course of its trade or business, and were capable of deceiving a substantial portion of the purchasing public.

272.   As a direct and proximate result of the unfair and deceptive practices committed by Toyota Group, Plaintiffs and Class Members have suffered and will continue to suffer actual damages in the form of, among other things, reduced vehicle valuation and injuries capable of repetition.

273.   As a result of its unfair and deceptive conduct, Toyota Group has been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

**THIRD CAUSE OF ACTION**

**Violation of Cal. Civil Code § 1710 Deceit and Common Law Fraud**

274.   Plaintiffs incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

275.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Richard Draeger, Stanley and Janet Neill, and Neil Stevens bring this claim against the Toyota Group.

276.   Pursuant to California Civil Code § 1710, deceit is either (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

277.   Toyota Group's actions constitute deceit under prong three (3) – Fraudulent Concealment/Nondisclosure – identified in Paragraph directly above.

278.   Moreover, the Defect presents a safety hazard to Plaintiffs and Class Members.

279.   Toyota Group had exclusive knowledge of and/or fraudulently concealed from and/or intentionally failed to disclose to Plaintiffs, the California Class, and all others in the chain of distribution (e.g., concealments and omissions in the Automakers' communications with wholesalers, retailers, and others in the chain of distribution that were ultimately passed on to Plaintiffs and the California

Class) the true nature of its Affected Vehicles, which is that they contain the Defect.

280.   Under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

281.   Toyota Group had a duty to disclose material facts regarding the true nature of its Affected Vehicles pursuant to the second, third, and fourth prongs set forth in the above paragraph:[148]

(a)     Toyota Group had and has a duty to disclose material facts about its Affected Vehicles because Toyota Group had exclusive knowledge of the true properties of its Affected Vehicles at the time of sale. The Defect is latent and not something that Plaintiffs or Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

(b)     Toyota Group had and has a duty to disclose material facts about its Affected Vehicles because Toyota Group undertook active steps to conceal them. Plaintiffs are aware of nothing in any of the Automakers' advertising, publicity, or marketing materials that discloses the truth about the Defect in its Affected Vehicles, despite ample evidence that Toyota Group was aware of the problem by virtue of, if nothing else, numerous consumer complaints.

282.   The facts concealed and/or not disclosed by Toyota Group to Plaintiffs and Class Members are material facts in that a reasonable person would

---

[148] For a complete list of Toyota Group's exclusive knowledge and/or active concealment of the Defect, *see* ¶228(e)(iii), *supra*.

have considered them important in deciding whether to purchase an Affected Vehicle.

283.   Toyota Group intentionally concealed and/or failed to disclose the fact that its Affected Vehicles contain the Defect for the purpose of inducing Plaintiffs and Class Members to act thereon.

284.   Plaintiffs and the Class Members justifiably acted or relied to their detriment upon the concealed and/or non-disclosed facts as evidenced by their purchase or lease of the Affected Vehicles.

285.   Had Plaintiffs and Class Members known that the Affected Vehicles contained the Defect, they would not have purchased or leased an Affected Vehicle.

286.   As a direct and proximate cause of each of the misconduct of Toyota Group, Plaintiffs and Class Members have suffered actual damages in that they bought or leased Affected Vehicles that do not perform safely, and they are now left with vehicles with reduced and diminished value in the marketplace.

287.   Toyota Group has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others.

288.   Toyota Group has acted with "malice" as that term is defined in Civ. Code § 3294(c)(1) by engaging in conduct that was and is intended by Toyota Group to cause injury to the Plaintiffs and Class Members.

289.   Toyota Group has committed "fraud" as that term is defined in Civ. Code § 3294(c)(3) through their concealment of material facts known to the Toyota Group with the intent to cause injury to the Plaintiffs and Class Members.

290.   Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Toyota Group for actual and punitive damages in accordance with Civ. Code § 3294(a) for themselves and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

## FOURTH CAUSE OF ACTION

### California False Advertising Law (FAL)
### (Bus. & Prof Code§ 17500 *et seq.*)

291.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

292.    The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Richard Draeger, Stanley and Janet Neill, and Neil Stevens bring this claim against the Toyota Group.

293.    California Business and Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. . . ."

294.    Toyota Group intended to sell or lease property (namely, its Affected Vehicles) to induce the public to enter into any obligation relating to its Affected Vehicles.

295.    Toyota Group caused to be made or disseminated throughout the United States, through advertising, marketing and other publications, statements that were misleading due to material omissions, and which were known, or which by the exercise of reasonable care should have been known to Toyota Group, to be misleading to consumers, Plaintiffs, and Class Members.

296.    Toyota Group violated section 17500 because the omissions regarding the Defect as set forth in this Complaint were material and likely to deceive a

reasonable consumer. In short, Toyota Group publically disseminated advertising that was misleading.

297.   Plaintiffs and Class Members have suffered injuries in fact, including the loss of money or property (namely, the diminution in value of their Affected Vehicles and/or overpayment for the same), as a result of the unfair, unlawful, and/or deceptive practices committed by Toyota Group. In purchasing or leasing their Affected Vehicles, Plaintiffs and Class Members relied on the omissions of the Automakers with respect to the safety of their vehicles. Had Plaintiffs and Class Members known the truth of the Defect, they would not have purchased or leased the Affected Vehicles and/or not paid as much for them.

298.   Accordingly, Plaintiffs and Class Members overpaid for the Affected Vehicles and did not receive the benefit of their bargain. One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles now that the truth has been exposed. A defective vehicle, by its very nature, is necessarily worth less than vehicles free of defects.

299.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of businesses by Toyota Group. Toyota Group is part of a pattern or generalized course of conduct that is still perpetuated and repeated nationwide.

300.   Plaintiffs and Class Members request that this Court enter such orders or judgments as may be necessary to enjoin Toyota Group from continuing their unfair, unlawful, and/or deceptive practices, and for such other relief set forth herein.

# FIFTH CAUSE OF ACTION

**Unjust Enrichment (Under California Law, in the Alternative, if the Court Determines the California Plaintiffs and the proposed California Class have no Adequate Remedy at Law under the California Plaintiffs' Other Named Causes of Action)**

301.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

302.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Richard Draeger, Stanley and Janet Neill, and Neil Stevens bring this claim against the Toyota Group.

303.   Toyota Group has been unjustly enriched by the purchases of its Affected Vehicles by Plaintiffs listed above.

304.   On behalf of all California Class Members who own or lease Affected Vehicles manufactured by Toyota Group, the above-named Plaintiffs seek to recover from Toyota Group under the equitable doctrine of unjust enrichment.

305.   The above-named Plaintiffs and the California Class Members unknowingly conferred a benefit on Toyota Group, which knew of the Defect but failed to disclose same to Plaintiffs and the California Class Members.

306.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit Toyota Group to retain the benefit of these profits that it unfairly has obtained from the above-named Plaintiffs and the California Class Members.

307.   The above-named Plaintiffs and the California Class Members, having been damaged, are therefore entitled to recover or recoup damages as a result of the unjust enrichment of Toyota Group.

**B.     Claims Brought on Behalf of the Massachusetts Class**

**SIXTH CAUSE OF ACTION**

**Violations of the Massachusetts Consumer Protection Act – Placeholder Claim Only**
**(Mass. Gen. Laws Ch. 93A)**

308.    Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

309.    The below-listed Plaintiff brings this Count on behalf of the Massachusetts Class. Specifically, Plaintiff and putative class representative Patricia Flannery brings this claim against the Toyota Group.

310.    Plaintiff Patricia Flannery brings this Count on behalf of the Massachusetts Class as a result of the unfair and deceptive acts of the Toyota Group.

311.    Plaintiff Patricia Flannery intends to assert a claim under the Massachusetts Consumer Protection Act ("MCPA") against Toyota Group, which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH.93A, § 2(1).  Plaintiff Patricia Flannery will make a demand in satisfaction of MASS. GEN. LAWS CH.93A, § 9(3) upon Toyota Group, and may amend this Complaint to assert claims under the MCPA once the required 30 days have elapsed.

312.    This Cause of Action is included for purposes of notice only and is not intended to actually assert a claim under the MCPA at this time.

**SEVENTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability**
**(Mass. Gen. Laws Ch. 106, § 2-314)**

313.    Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

314.   The below-listed Plaintiff brings this Count on behalf of the Massachusetts Class. Specifically, Plaintiff and putative class representative Patricia Flannery brings this claim against the Toyota Group.

315.   Toyota Group is and was at all relevant times merchants with respect to motor vehicles.

316.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

317.   These Affected Vehicles, equipped with Keyless Fobs that lack Auto-Off, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which Affected Vehicles are to be used. Specifically, the Affected Vehicles are inherently defective in that the Affected Vehicles' Keyless Fobs lack Auto-Off, a critical safety function.

318.   Toyota Group was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and the Class. [149]

319.   As a direct and proximate result of the breach of the warranties of merchantability by Toyota Group, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Fraudulent Concealment
### (Based on Massachusetts Law)

320.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

321.   The below-listed Plaintiff brings this Count on behalf of the Massachusetts Class. Specifically, Plaintiff and putative class representative Patricia Flannery brings this claim against the Toyota Group.

---

[149] For a complete list of Toyota Group's exclusive knowledge and/or active concealment of the Defect, *see* ¶228(e)(iii), *supra*.

322.   Toyota Group had exclusive knowledge of and/or intentionally concealed the above-described material safety information regarding Keyless Fobs without Auto-Off, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class Members information that is highly relevant to their purchasing or leasing decision.

323.   The Affected Vehicles purchased or leased by Plaintiff and the other Class Members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs without Auto-Off, as alleged herein.

324.   Toyota Group had a duty to disclose that its Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect, because Toyota Group had exclusive knowledge and/or actively concealed that Keyless Fobs without Auto-Off are dangerous and defective.

325.   The aforementioned concealment was material because if it had been disclosed, Plaintiff and the other Class Members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

326.   Plaintiff and the other Class Members relied on the reputation of Toyota Group – along with the failure to disclose the faulty and defective nature of the Keyless Fobs without Auto-Off – in purchasing or leasing the Affected Vehicles.

327.   As a result of their reliance, Plaintiff and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

328.   The conduct of Toyota Group was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights

of Plaintiff and the other Class Members. Plaintiff and the other Class Members are therefore entitled to an award of punitive damages.

### NINTH CAUSE OF ACTION

**Unjust Enrichment (Under Massachusetts Law, in the Alternative, if the Court Determines the Massachusetts Plaintiff and the proposed Massachusetts Class have no Adequate Remedy at Law under the Massachusetts Plaintiff's Other Named Causes of Action)**

329.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

330.  The below-listed Plaintiff brings this cause of action for herself and on behalf of the Massachusetts Class. Specifically, Plaintiff and putative class representative Patricia Flannery brings this claim against the Toyota Group.

331.  Toyota Group has been unjustly enriched by the purchases of its Affected Vehicles by Plaintiff listed above.

332.  On behalf of all Massachusetts Class Members who own or lease Affected Vehicles manufactured by Toyota Group, the above-named Plaintiff seeks to recover from Toyota Group under the equitable doctrine of unjust enrichment.

333.  The above-named Plaintiff and the Massachusetts Class Members unknowingly conferred a benefit on Toyota Group, which knew of the Defect but failed to disclose same to Plaintiff and the Massachusetts Class Members.

334.  The circumstances are such that it would be inequitable, unconscionable and unjust to permit Toyota Group to retain the benefit of these profits that it unfairly has obtained from the above-named Plaintiff and the Massachusetts Class Members.

335.  The above-named Plaintiff and the Massachusetts Class Members, having been damaged, are therefore entitled to recover or recoup damages as a result of the unjust enrichment of Toyota Group.

**C.    Claims Brought on Behalf of the New Jersey Class**

**TENTH CAUSE OF ACTION**

**Violations of the New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. §§ 56:8-1, *et seq.*)**

336.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

337.   The below-listed Plaintiffs bring this Count on behalf of the New Jersey Class. Specifically, Plaintiffs and putative class representatives Helen Ciangiulli, Judith Harr Shane, and Steven Green bring this claim against the Toyota Group.

338.   The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ("NJ CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

339.   In the course of the business of Toyota Group, it willfully failed to disclose and actively concealed the dangerous risk of the Keyless Fobs in Affected Vehicles as described above. Accordingly, Toyota Group engaged in unfair and deceptive trade practices, including engaging in conduct likely to deceive.

340.    Further, the acts of Toyota Group and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Toyota Group fraudulently concealed the defective nature of its Affected Vehicles from consumers.

341.   The actions of Toyota Group as set forth above occurred in the conduct of trade or commerce.

342.   The conduct of Toyota Group proximately caused injuries to Plaintiffs and the other Class Members.

343.   Plaintiffs and the other Class Members were injured as a result of the conduct by Toyota Group in that Plaintiffs and the other Class Members overpaid

for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the omissions of Toyota Group.

344.   Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint upon filing the same.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (N.J. Stat. Ann. § 12A:2-314)

345.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

346.   The below-listed Plaintiffs bring this Count on behalf of the New Jersey Class. Specifically, Plaintiffs and putative class representatives Helen Ciangiulli, Judith Harr Shane, and Steven Green bring this claim against the Toyota Group.

347.   Toyota Group is and was at all relevant times merchants with respect to motor vehicles.

348.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

349.   These vehicles and the Keyless Fobs without Auto-Off in the Affected Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Vehicles are inherently defective in that the Keyless Fobs without Auto-Off is a safety defect that can, and has, caused injuries and deaths.

350.   Toyota Group was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class.[150]

351.   As a direct and proximate result of the breach of the warranties of merchantability by Toyota Group, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### Fraudulent Concealment
### (Based on New Jersey Law)

352.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

353.   The below-listed Plaintiffs bring this Count on behalf of the New Jersey Class. Specifically, Plaintiffs and putative class representatives Helen Ciangiulli, Judith Harr Shane, and Steven Green bring this claim against the Toyota Group.

354.   Toyota Group had exclusive knowledge of and/or intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class Members information that is highly relevant to their purchasing or leasing decision.

355.   The Affected Vehicles purchased or leased by Plaintiffs and the other Class Members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs without Auto-Off, as alleged herein.

356.   The Automakers had a duty to disclose that its Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect,

---

[150] For a complete list of Toyota Group's exclusive knowledge and/or active concealment of the Defect, *see* ¶228(e)(iii), *supra*.

because Toyota Group had exclusive knowledge and/or actively concealed that Keyless Fobs without Auto-Off are dangerous and defective.

357.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class Members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

358.   Plaintiffs and the other Class Members relied on the reputation of Toyota Group – along with the failure to disclose the faulty and defective nature of the Keyless Fobs without Auto-Off – in purchasing or leasing the Affected Vehicles.

359.   As a result of their reliance, Plaintiffs and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

360.   The conduct of Toyota Group was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class Members. Plaintiffs and the other Class Members are therefore entitled to an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION

**Unjust Enrichment (Under New Jersey Law, in the Alternative, if the Court Determines the New Jersey Plaintiffs and the proposed New Jersey Class have no Adequate Remedy at Law under the New Jersey Plaintiffs' Other Named Causes of Action)**

361.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

362.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the New Jersey Class. Specifically, Plaintiffs and putative class representatives Helen Ciangiulli, Judith Harr Shane, and Steven Green bring this claim against the Toyota Group.

363.   Toyota Group has been unjustly enriched by the purchases of its Affected Vehicles by Plaintiffs listed above.

364.   On behalf of all New Jersey Class Members who own or lease Affected Vehicles manufactured by Toyota Group, the above-named Plaintiffs seek to recover from Toyota Group under the equitable doctrine of unjust enrichment.

365.   The above-named Plaintiffs and the New Jersey Class Members unknowingly conferred a benefit on Toyota Group, which knew of the Defect but failed to disclose same to Plaintiffs and the New Jersey Class Members.

366.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit Toyota Group to retain the benefit of these profits that it unfairly has obtained from the above-named Plaintiffs and the New Jersey Class Members.

367.   The above-named Plaintiffs and the New Jersey Class Members, having been damaged, are therefore entitled to recover or recoup damages as a result of the unjust enrichment of Toyota Group.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class Members, pray that the Court enter judgment against Toyota Group, as follows:

(a)   An order certifying the proposed State Classes, designating Plaintiffs as named representatives of the relevant Class and/or Sub-classes, and designating the undersigned as Class Counsel;

(b)   A declaration that the lack of Auto-Off in Toyota Group's Affected Vehicles is defective;

(c)   A declaration that Toyota Group is financially responsible for notifying all Class Members about the defective nature of its Affected Vehicles due to the lack of Auto-Off;

1          (d)     An order requiring Toyota Group to notify all State Class and

2  Sub-class Members that his/her Affected Vehicle lacks Auto-Off, a potentially

3  deadly safety defect;

4          (e)     An order requiring Toyota Group to permanently repair its

5  Affected Vehicles so that they no longer possess the Defect;

6          (f)     An order requiring Toyota Group to include Auto-Off in any

7  newly-produced vehicles with Keyless Ignitions so that they no longer possess the

8  Defect;

9          (g)     An award to Plaintiffs and Class Members of compensatory,

10  exemplary, and statutory damages, including interest, in an amount to be proven at

11  trial;

12          (h)     A declaration that Toyota Group must disgorge, for the benefit

13  of Plaintiffs and Class Members, all or part of the ill-gotten profits they received

14  from the sale or lease of its Affected Vehicles, or make full restitution to Plaintiffs

15  and Class Members;

16          (i)     An award of attorneys' fees and costs, as allowed by law;

17          (j)     An award of attorneys' fees and costs pursuant to Cal. Code

18  Civ. P. § 1021.5;

19          (k)     An award of pre-judgment and post-judgment interest, as

20  provided by law;

21          (l)     An injunction under Rule 23(b)(2) barring Toyota Group from

22  selling future vehicles with the Defect;

23          (m)     An injunction under Rule 23(b)(2) requiring Toyota Group to

24  institute Auto-Off in all Affected Vehicles;

25          (n)     Leave to amend this Complaint to conform to the evidence

26  produced at trial; and

27          (o)     Such other relief as may be appropriate under the

28  circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: November 25, 2015

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Lee M. Gordon*
Lee M. Gordon (SBN 174168)
Elaine T. Byszewski (SBN 222304)
301 N. Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
lee@hbsslaw.com
elaine@hbsslaw.com

Martis Alex (SBN 77903)
Daniel R. Leathers *(pro hac vice to be sought)*
Brian R. Morrison *(pro hac vice to be sought)*
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
malex@labaton.com
dleathers@labaton.com
bmorrison@labaton.com

Steve W. Berman *(pro hac vice to be sought)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
steve@hbsslaw.com